ifest that the sole cause of the collision was the mistaking by the St. John of the position of the Pluto and her tows, and the mistaken signal which the St. John gave for the Pluto to keep to the westward, which signal, in the position the Pluto was in, was properly answered by the starboarding of her helm. The St. John was wholly in fault, and the Pluto and the Ulster County were free from fault. The Pluto, as soon as a collision appeared inevitable, slowed and stopped, and used all proper means to avoid it.

---

## Case No. 12,224.

### The ST. JOHN.

### [7 Blatchf. 220.] [1]

Circuit Court, S. D. New York. April 23, 1870. [2]

COLLISION — ON RIVER — LOOKOUT — DAMAGES — SUIT BY CARRIER—PLEADING—AMENDMENT.

1. Where a steamboat was going down the Hudson river, and another steamboat was going up that river with a barge in tow on her port side, and a collision occurred between the former vessel and the barge, in consequence of the attempt of the former vessel to pass on the starboard side of the latter vessel, the latter vessel being near the shore that was on her starboard side: *Held*, that the former vessel was in fault.

[Cited in The B. B. Saunders, 19 Fed. 122; The Garden City, Id. 532; The Cement Rock, 38 Fed. 765.]

2. Steamboats meeting on the Hudson river must pass to the right, unless there be some substantial reason why that cannot be done.

3. The necessity of a lookout on the bow of a large steamboat, enforced.

4. A steamboat which gives a signal to another vessel for a departure from the ordinary rule

---

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

2 [Modifying Case No. 10,223. Decree of circuit court affirmed by supreme court in 154 U. S. 586, 14 Sup. Ct. 1170.]

of navigation, must take the hazard of the consequences of making such departure herself, whether she hears a response to such signal or not.

[Cited in The Milwaukee, Case No. 9,626; The B. B. Saunders, 25 Fed. 731; The John King, 1 C. C. A. 319, 49 Fed. 472; The Florence, 68 Fed. 942.]

5. An amendment of the libel as to the amount of damages claimed, in a suit on a collision, allowed, to remove a formal difficulty in the way of a just award.

6. A carrier can maintain an action, in admiralty, for damage done to goods in his care.

7. The amount actually paid for the hire of another vessel to replace one damaged by a collision, is more satisfactory evidence of the proper amount of demurrage to be allowed for the loss of the use of the damaged vessel while being repaired, than the mere opinions of witnesses giving a higher estimate of the value of such use.

[Cited in Petty v. Merrill, Case No. 11,050.]

[Appeal 'from the district court of the United States for the Southern district of New York.

. [This was a libel for damages resulting from a collision. There was a decree in the district court condemning the St. John, with a reference to a commissioner to ascertain the amount. Case No. 12,223. From that decree the present appeal was taken.]

Welcome R. Beebe and Charles Donohue, for libellant.

Charles Jones, for claimants.

WOODRUFF, Circuit Judge. There is very great difficulty in determining, from the evidence, the precise manner in which the collision in question herein was caused. The steamboat St. John, at about three o'clock, a. m., on the 20th of November, 1864, was on her voyage from Albany to New York, on the Hudson river. The steamboat Pluto, having the barge of the libellant in tow and lashed to her port side, was on her voyage up the river from New York to New Paltz in Ulster county. The night was clear and the moon about "half size." At some point in the river very near to West Point—either at the Point, or a little above or a little below—the bow or stem of the St. John struck the port side of the barge and the injury was sustained which is the subject of investigation.

There are some facts either not disputed or so far established, that I think a safe and just conclusion is attainable. At Magazine Point, a short distance above West Point, the river, in its downward course, turns abruptly eastward, and then, at West Point, abruptly southward, describing, in the two curves, the central portion of the letter S. The Pluto was proceeding up the river, having the barge in question and two others in tow, and was near the eastwardly shore of the river, about one quarter of a mile below West Point, when she saw the St. John coming down, the St. John then being at or not far below Magazine Point, and about one quarter of a mile above West Point. The St. John, having turned Magazine Point, saw the Pluto below

West Point, and her pilot and his assistants took her to be, as she was in fact, a steamboat with barges in tow. The pilot of the St. John, from his elevated position in the pilot-house, saw the stern-light of the Pluto, as he says, over the Point, before he could see her hull or lower lights, and judged that she was in the westwardly part of the river, or, as he expresses it, "I thought she was best to the west shore." He thereupon determined to pass to the left, or on the starboard side of the Pluto. The testimony pretty clearly establishes, (so far as the opinions of the witnesses, formed on such a subject at such a time, aided by their knowledge of the course of the river and the shores, and, hence, the distance in a right line at which persons on approaching vessels can there see each other,) that the two steamboats were then nearly a half of a mile apart. Believing the Pluto to be towards the west shore of .the river, and concluding to pass to the eastward of her, the pilot of the St. John signalled that intention to the Pluto by two whistles, and, with the helm of the St. John hard-a-starboard, bore towards the east side of the river. At what precise moment he starboarded the helm is not very material. He must have put his helm a-starboard to make the necessary turn at Magazine Point, and he and his three assistants at the wheel all testify that; after that manoeuvre, the helm was not changed before the collision. He heard no response to his signal, and, shortly after, he repeated it, by again blowing two whistles, and yet heard no response, and, having, as I am satisfied, already given the order to slow, as he came around Magazine Point, he rang to stop and then to back, but, notwithstanding, as the pilot and his witnesses say, he had gotten some rear-way on the St. John, her bow struck the port side of the barge, and broke into her, so that she soon sank.

On the barge, the whistles were heard, and the pilot of the barge testifies, that he answered by two whistles, to signify his assent to pass to the west or on the starboard side of the St. John, and put his helm to starboard, to aid in that movement; but it is obvious that, either because the Pluto was moving slowly, or because she was hindered by her tows, she had made but little progress westward when the collision took place. The witnesses generally agree that the point of collision was about the centre of the river. My own judgment, upon all the proofs, is, that it was eastwardly of the centre; else, the barge could not have been struck on her port bow, if any reliance is to be placed on the testimony of the witnesses for the claimants, that the wheel of the St. John was not changed after it was hove to starboard. This fact, that she was so struck, is, in my mind, an important one, in corroboration of those witnesses; for, if the St. John had been turned to the westward, to go around West Point, before the collision, she must, if she collided at all with the barge, have struck her on

her starboard and not on her port side. And, to my mind, it shows, also, that the place of actual collision was above the place where the St. John would port her helm to take her course down the river, and that the collision occurred while she was endeavoring to pass to the east of the Pluto and her tows, but before the pilot of the St. John comprehended the result of his mistake as to their position.

The collision was, therefore, due to the attempt of the St. John to pass to the eastward, or on the starboard side, of the Pluto and her tows. It is true, that the witnesses for the claimants say that the course of the St. John was according to the usual course of steamboats of her size coming down the river, and that it is desirable to go far to the east before taking a course down the river opposite West Point. No doubt, there is greater convenience in doing so; but it is not proved that there is any difficulty in heaving the helm to port in season to keep in the middle, or westerly of the middle, of the river off that point.

The rule of navigation requires that steamboats meeting shall pass to the right unless there be some substantial reason why that cannot be done. The Pluto, with her tows, was in her proper position, and it was the duty of the St. John to avoid her. If, by her two whistles, she invited a departure from the rule, she took the risk, both of her own whistles being heard, and, in turn, of hearing the response, if a response was made. She had no right to dictate to the other boat a departure from the ordinary rule of navigation; and the hazard of the consequences of giving such a signal, whether she heard a response or not, rested upon her, if she persisted in her endeavor to pass on the starboard side of the other.

The mistake of the pilot of the St. John was, necessarily, of a two fold character. From his position, looking in a straight line across the end of West Point, his belief that the light of the Pluto was to the west of the centre of the river, involved, also, the idea, that she was further north. that is, nearer the Point, than she was. Had his supposition been correct, there would have been ample room for him to continue to swing around toward the east and then take up his course on the east side down the river. But, the Pluto being on such east side when seen, she was unable to get out of the way of this movement. The St. John should have ported her helm, or, at least, have steadied it, earlier, and the accident would not have happened.

On the Pluto nothing was done or omitted of which the St. John can complain. She had a perfect right to keep her course; and the St. John cannot complain that, in assent to her invitation to sheer to the west, the Pluto attempted to do so. It was not the fault of the Pluto, if her whistles were not heard by the St. John.

The claimants, while they insist that the question of the sufficiency of the lookout can have no bearing on the liability of the St. John, because the proof shows that the pilot and his assistants in the pilot-house did, in fact, see the Pluto as soon as it was possible to see her beyond West Point, and sooner, from their elevated position, than a lookout on the bows could have seen her, nevertheless claim that the Pluto was in fault in not having had a sufficient lookout. In the first place, the pilot of the Pluto had placed a man at the wheel, and was himself forward on the lookout, and saw the St. John as soon as she came around Magazine Point. He was not only on the lookout, but was looking for the St. John herself, as he knew that she was, in due course, at or near that Point. I think the Pluto not in fault in that respect. In the second place, I am not satisfied that a lookout on the bow of so long a boat as the St. John would not have been so far forward of the pilot-house as to see the Pluto sooner than the pilot did, nor that, when he saw her, he would not have more accurately judged respecting her position and saved the St. John from the collision.

The proofs are not such as to warrant a reversal of the decree of the district court charging the St. John with the consequences of the collision. The case of The Johnson, 9 Wall. [76 U. S.] 146, is instructive and sustains the views above expressed, as well in regard to the duty of the St. John to go to the right and pass on the port side of the Pluto, as, also, to the risk she assumed in blowing her whistles as an invitation to a departure from the usual rule. If it were true that the navigation of the river is so difficult, and the St. John so long, that she cannot govern herself by those principles in passing through the turns in the river, then she should have slowed much earlier, and have come around Magazine Point with such moderation that she could pick her way without endangering other vessels which are themselves without fault; and no desire to keep up her speed or not to lose time in making the turns, nor any mere convenience in turning, furnishes any excuse for not doing so.

In regard to the exceptions to the report of the commissioner and the objection to the allowance of an amendment of the libel in respect to the claim for damages, I have examined these questions, and, without extended discussion, it must suffice to say: (1.) The court undoubtedly had power to allow an amendment, in its discretion, going not to the introduction of a new cause of action, but only to the removal of a formal difficulty in the way of a just award. (2.) The right of a carrier to maintain an action for damage done to goods in his care, and for the safe and sound delivery of which he is responsible, cannot be questioned. He has such right even at common law, on strict principles. Here, if the claimants deemed

themselves entitled to insist that the owners not yet satisfied for their loss should be made parties, they should have sought such relief earlier. On appeal, no such objection will be entertained. Even the master of a vessel is permitted, in admiralty, to proceed for a collision. (3.) The other objections are, I think, without just foundation, except the one to the allowance of fifty dollars per day for the demurrage or loss of the use of the barge for the residue of the season. It appears, by the testimony of the libellant, that he actually hired another barge, for the residue of the season, for one thousand dollars; and he does not show that the service of that barge was not as useful to him as that of the barge which was injured. This is more satisfactory evidence of the extent of the libellant's loss than the opinions of the other witnesses.

I am not fully satisfied with the allowance of twelve hundred dollars for depreciation,— The Isaac Newton [Case No. 7,091]; but I cannot say that the proofs do not justify the report of the commissioner in that respect.

The sum of five hundred dollars must be deducted from the decree, and, as to the residue, it should be affirmed, without costs of appeal.

[On appeal to the supreme court, the decree of this court was affirmed. 154 U. S. 586, 14 Sup. Ct. 1170.]