## The B. B. Saunders. (Two Cases.)

*(District Court, S. D. New York.　January 7, 1884.)*

1. Collision—Action for Damages—Tort.
   An action for damages occasioned by collision is an action of tort founded upon negligence.

2. Same—Answer—Negligence.
   Where the answer denies any negligence, the burden of proof is upon the libelant, unless the answer states, or by not denying admits, facts from which negligence is legally presumed.

3. Same—Inspectors' Rules—Fifth Situation.
   The supervising inspectors, under the act of Feburuary 28, 1871, (section 4412, Rev. St.,) have authority to frame additional regulations in regard to steamers passing each other, not in conflict with the statutory rules. Their rules requiring steamers in the fifth situation to pass ordinarily to the right, but permitting vessels in peculiar situations to pass to the left upon sounding a signal of two whistles, is within the scope of their powers, and obligatory on vessels navigating the harbors.

4. Same—Answering Signals.
   The requirement that the signal in answer to the exceptional signal of two whistles shall be given "promptly," is not complied with except by an immediate answer, before other maneuvers are taken, where no reason for delay appears.

5. Same—Case Stated.
   Where the tugs B. B. S. and O. were approaching each other upon crossing courses in the East river in the fifth situation, and the O., having the B. B. S. on her starboard hand, sounded a signal of two whistles, and the B. B. S., without first replying thereto, immediately signaled to her engineer to stop and back his engines,—a proper maneuver in accordance with that signal,—but did not immediately answer the two whistles, and very shortly after the O. gave a signal of one whistle, which was immediately answered by one whistle, and a collision ensued, and the case was submited by both sides without other evidence, *held,* that the B. B. S. was in fault in not answering promptly the O.'s

signal of two whistles before proceeding to maneuver in accordance with it; that it is imposssble to say that the delay and the change of signals may not have contributed to the collision; and that the B. B. S. was therefore liable.

The above libels were filed to recover $9,500 damages for injuries sustained by the canal-boat H. B. Wilbur and cargo, which was in tow of the B. B. Saunders, through a collision with the steam-tug Orient, on the twenty-sixth of September, 1879, in the North river, opposite Harrison street. The Saunders, at about 12 M., had left pier 40, North river, with the Wilbur lashed to her port side to be towed to Newark. The day was clear and the tide slack. About 10 minutes after leaving the slip, when the tug was about a third of the way across the river and heading down stream, the Orient was seen coming out of the Harrison-street slip. She bore about three or four points off the Saunders' port bow. Shortly afterwards, as the answer states, the Orient "blew a signal of two blasts of her steam-whistle to signify to the Saunders that the Orient desired to pass across the river in front of the Saunders; that the pilot of the latter thereupon gave a signal to the engineer of his vessel to slow her engine; that almost instantly, and before said pilot had time to do anything further, the Orient blew a signal of one blast of her steam-whistle to signify to those on board the Saunders that the Orient intended to pass astern of her; that the Saunders immediately replied to said second signal with a single blast of her steam-whistle, and signaled the engineer of the Saunders to go ahead at full speed, and then put her helm to port; that these orders were obeyed, but the Orient continued upon her former course across the river without change until she struck the Wilbur."

The libelants called one witness, who was on board the Wilbur, who testified that he saw the Orient coming straight out of either Harrison or Canal street slip, apparently going across the river ahead of him; that he did not notice her again, being occupied, until she was within 30 or 40 feet of him, and that she came straight upon the Wilbur, striking her about amid-ships; and that at that time the head of the Saunders was canted towards New York, and that the captain only was in the pilot-house. They also read the deposition of the engineer of the Orient, showing that at the time of the collision the engines of the latter were backing, but he did not know whether her headway was stopped or not. Upon this evidence and the pleadings the libelant rested, and the claimants submitted the case upon this testimony, claiming that no *prima facie* case had been made out against the Saunders requiring any exculpating evidence on their part. The answer also states that shortly before the collision, and when it was seen to be inevitable, the pilot of the Saunders starboarded his helm to ease the blow.

*T. L. Ogden* and *Chas. M. Da Costa*, for insurance company.

*E. D. McCarthy*, for libelant, Toole.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for claimant.

BROWN, J. The libelants contend that it is a point of great practical importance in this case, and in others similar, that they should not be compelled to call unfriendly witnesses when not absolutely necessary; and they rested their case upon the pleadings, and the slight testimony of two witnesses, as making out a *prima facie* case of negligence in the Saunders, at the same time claiming, also, that the Saunders, having taken the tug in tow under a contract to transport her to Newark, should be legally treated as a bailee, bound affirmatively to excuse herself for not having fulfilled her engagement. The engagement to tow the tug to Newark is averred in the libels and is not denied in the answer. It is unnecessary to inquire how the burden of proof would stand if the libels were filed upon such a contract only. That is not the case here. They expressedly state that they are filed in a cause "of collision." Both tugs were originally proceeded against; the averments are equally against both; negligence is charged against both; and the little evidence given does show that the Wilbur was run into by the Orient. Shortly after the commencement of the first suit, the Orient was sold for seamen's wages, and no surplus remained after satisfying that decree, and the case now proceeds against the Saunders alone. The case as presented is not one of contract, but of tort; and the foundation of the actions against both vessels is negligence in the tugs. A *prima facie* case of negligence must therefore be made to appear, either from the pleadings or from the evidence, or else the libels must be dismissed.

In the case of *The L. P. Dayton*, 10 Ben. 430, 433, 18 Blatchf. 411, the libelant in a somewhat similar case rested without any proof, both tugs being there before the court, and each by its own answer exculpating itself, and showing the whole fault to have been in the other. The canal-boat in that case was in tow of the Dayton. BLATCHFORD, J., says:

"As respects the Dayton, no *prima facie* case of negligence is shown by her answer. The fact that the collision occurred while the Centennial was under the control and direction of the Dayton, and had neither propelling nor steering power of her own, is not *prima facie* evidence of negligence in the Dayton."

See, also, the English cases there cited, and *The Florence P. Hall*, 14 FED. REP. 408, 416, 418; *The Morning Light*, 2 Wall. 550, 556.

I do not think the evidence sufficient to show that there was no lookout on duty, or no other pilot than the captain on board. The evidence is sufficient, however, to show that the two tugs were approaching each other upon crossing courses, so as to be in the fifth situation, the Orient having the Saunders on her own starboard hand. It was the duty of the Orient, therefore, to keep out of the way. She blew two whistles to indicate that she would cross the bows of the Saunders. The supervising inspector's rules of 1875 required that the Orient, in such a situation, should ordinarily go

astern of the Saunders, having previously given one blast of the steam whistle. Rule 2, and the illustrations, pp. 37, 38. The note under rule 6, however, states that—

"The foregoing rules are to be complied with in all cases except when steamers are navigating in a crowded channel, or in the vicinity of wharves. Under such circumstances, steamers must be run and managed with great caution, sounding the whistle as may be necessary to guard against collision or other accidents."

And at page 38, under the illustrations, it is further said:

"When, for good reason, in rivers, and narrow and difficult channels, a pilot finds it necessary to deviate from the standing rule just stated, he shall give early notice of such intention to the pilot of the other steamer by giving two blasts of the steam-whistle, and the pilot of the other vessel shall answer promptly with two blasts of his whistle, and both boats shall pass to the left."

In these rules I do not perceive anything beyond the scope of the powers conferred upon the supervising inspectors by section 4412 of the Revised Statutes, (Act of February 28, 1871, § 29, 16 St. at Large, 450; Act of 1852, § 29, 10 St. at Large, 72.) Under rule 19 of the statutory rules of navigation, (section 4233,) considered alone, when steam-vessels are crossing in the fifth situation, the steam-vessel which has the other on her starboard hand would doubtless have an option to go on either side of the other; but that option would exist, not by force of any statutory authority, but simply through the absence of any limitation as to the mode in which she might perform her duty of "keeping out of the way." But after the statutory rules were adopted in April, 1864, (13 St. at Large, 58, p. 60, arts. 14, 18,) the authority of the supervising inspectors was renewed by the Act of 1871 (section 4412) to establish additional "regulations to be observed by all steam-vessels in passing each other." Regulations thus established, and not in conflict with the statute rules, are manifestly binding.

It seems to me entirely competent for the inspectors, under this authority, to establish by rule in what particular mode vessels meeting in the fifth or sixth situation shall pass each other. The statute makes no provision as to the mode of passing, but requires only that the one vessel shall keep out of the way of the other. Where there are two ways of doing this, equally available, it is not inconsistent with the statute for the supervising inspectors to provide that it shall ordinarily be done in one of those ways, and not in the other; and by going to the right, rather than to the left, when there is nothing to prevent this course. All that I understand BENEDICT, J., in the case of *The Atlas*, 4 Ben. 30, to have disapproved in the former rules, was in so far as the regulation required a port helm *in all cases*. The vessel required to keep out of the way, he says, "may proceed according as the case requires, and it was a fault in her to port if starboarding afforded the only opportunity of avoiding the disaster." The present regulations of the supervisors, with the provisions above

quoted, provide fully for these contingencies and exceptions. The mere fact that rule 2 of the present regulations limits the course of the vessel bound to keep out of the way, in ordinary circumstances, to one of the two alternatives which she would otherwise have an option of choosing, is no objection, as it seems to me, to this rule. All regulations necessarily restrict, and are intended to restrict and make definite, what was previously undefined and subject to the choice of the parties; and the regulation in question seems to me to be clearly calculated to promote certainty in navigation, and to avoid danger, as well as to permit all reasonable and necessary means of doing so. In effect, it re-establishes what was regarded as the rule previously existing in ordinary cases. *The Johnson,* 9 Wall. 146, 153; *The St. John,* 7 Blatchf. 220; *The Washington,* 3 Blatchf. 276. Rule 2, requiring vessels meeting obliquely to pass ordinarily to the right, subject to the qualifications above quoted, and the requirement of signals to be given and answered "promptly," I must regard as strictly obligatory. Non-observance of these requirements has been repeatedly held to be a fault sufficient to charge the offending vessel with contributory negligence. *The Grand Republic,* 16 Fed. Rep. 424, 427; *The Clifton,* 14 Fed. Rep. 586; *The Wm. H. Beaman,* 18 Fed. Rep. 334.

The pilot of the Orient, presumably for good reason, desiring to pass ahead or to the left, gave two blasts of his steam-whistle, as required by the exceptions above quoted. The pilot of the other vessel heard these signals, and was thereupon required to "answer promptly." Instead of doing so, the pilot of the Saunders, as appears from her answer, proceeded to maneuver his own vessel upon the basis of that signal by an order to slow his engine, but without previously informing the Orient of that intention or maneuver, but "almost instantly," as the answer continues, "and before he had time to do anything further, the Orient blew a signal of one whistle, to which the Saunders replied with one, and put her engine full speed ahead. The collision followed, though, as the answer of the Saunders alleges, wholly through the fault of the Orient. The answer states no reason, however, why the signal of two whistles was not responded to "promptly" before signaling to her engineer to slow her own engines. The case as submitted, therefore, presents only the extremely narrow, but naked, technical question, whether, where no reason appears for a contrary course, an answering signal is required, by the inspectors' rules, to be given at once, and before any other maneuvers are taken; for if the rule does require that, then the Saunders is *prima facie* in fault, and is called upon either to justify her departure from the rule, or else to show that such departure in no way contributed to the collision. I think this question must be answered in the affirmative, and especially so where the signal received is one proposing an exceptional course, as in this case. The vessel first giving such an exceptional, though lawful, signal, certainly ought to

be informed immediately whether it is assented to or not, in order that her own navigation may be guided accordingly. She cannot rightly be kept in suspense, not knowing whether her proposal is to be assented to or not, or which way to shape her course. The object of mutual signals is the mutual understanding of each other's course. The rule requires a prompt reply to prevent suspense and miscalculation. To act upon exceptional signals received by maneuvering accordingly, without previous notice of acceptance, is a double wrong, and misleads in two ways: *First*, by inducing in the other vessel the belief of dissent through the delay; and, *second*, by a change of course or rate of speed without notice. If the rule requiring the answer to be given "promptly" is not enforced literally, so as to exclude all other maneuvers before answering which are not shown to be necessary by the circumstances, the regulation requiring an answer to signals can be of little avail, and might rather prove a snare than a help to safe navigation. It is impossible to say that the result of the delay in this case, however small it may have been, was not the cause of the Orient's changing her signal of two whistles to that of one whistle, and thereby the cause of the collision which followed.

As the evidence and pleadings, therefore, are sufficient to show that the rule of the fifth situation is applicable, and that the Saunders failed to respond promptly to the signal given, as required by the inspectors' regulations, and no reason for this failure to respond promptly being alleged in connection with this admission in the answer, or proved, I must hold that there is a *prima facie* fault shown in the Saunders in this respect; and, as it is impossible to say that this fault did not contribute to the collision, the libelant is entitled to a decree, with costs. *The Pennsylvania*, 19 Wall. 125, 137.