## THE GARDEN CITY, etc.

### (*District Court, S. D. New York.* January 31, 1884.)

1. COLLISION—RIVER AND HARBOR NAVIGATION—RIGHT OF WAY.

   A steamer meeting another in the fifth situation, and bound to keep out of her way,—if able to do so through stopping and backing,—has no right to go to the left and attempt to cross the bows of the other when there is not sufficient time or space to pass in that manner without a collision, unless the other vessel either stops or changes its course; the latter has the right of way, and the right to proceed on her course without obstruction.

2. SAME—SIGNALS—TIMELY NOTICE.

   In river and harbor navigation, although for good reason a vessel may, under the inspectors' rules, signal that she will go to the left, instead of the right, these rules require early notice of such intention, and such a notice is not early or timely when it would compel the other vessel to stop in order to avoid a collision, unless in a situation where the former vessel has no other alternative.

3. SAME—INSPECTORS' RULES.

   Under the inspectors' rules the vessel signaled is bound to give an answer promptly, either of assent or dissent.

4. SAME—MUTUAL FAULT.

   Where the ferry-boats G. C. and R. were approaching each other in the East river in the fifth situation, and the latter being on the former's starboard hand, and the G. C., instead of stopping and backing, as she might have done, signaled with two whistles, and at the same time starboarded her helm so as to cross the R.'s bows, and the latter made no answering signal, and the G. C., after going about a length under a starboard wheel, again signaled with two whistles, to which there was no response, and she then stopped and backed until the collision, which happened shortly after, and the evidence being contradictory as to the other details of the maneuvering of the two vessels, *held*, that both were in fault: the G. C., for undertaking to pass to the left and cross the R.'s bows without assenting signals, and the latter for not answering as required, and thereby preventing the embarrassment and confusion of the G. C., which in this case plainly contributed to the collision.

5. SAME—EXCUSE—DEPARTURE FROM RULES.

   Though the G. C. ran in connection with railroad trains, and the avoidance of unnecessary stops was desirable, and though the usual course of the R. at this point was to swing to port, *held*, that these facts, though a sufficiently good reason for the signal of two whistles, given by the G. C., regarded merely as a proposition or request to pass to the left, were not a justification for any departure from the rules of navigation, without assenting signals from the R. in reply.

In Admiralty.

*Benjamin D. Silliman*, for libelant.

*Shipman, Barlow, Larocque & Choate*, for claimant.

BROWN, J. This action was brought to recover damages for a collision between two ferry-boats—the Republic and the Garden City—about 4:30 o'clock, in the afternoon of August 17, 1878, off Catharine street, in the East river. The day was fair, the wind light, the tide three-quarter ebb. The Republic belonged to the Catharine-street ferry, and was proceeding across the river towards Main street, Brooklyn. The Garden City was coming down the river from Hunter's Point, with the tide, to her slip at James street. At the time of collision the Garden City was heading nearly down the river, but a little

toward the Brooklyn shore; the Republic was going nearly across the river, but heading a little downward. The starboard bow of the Garden City, which was much the larger boat, struck the port bow of the Republic, and her guards ran over the deck of the latter, inflicting some injury. The blow was comparatively a light one, as both boats were nearly stopped.

According to the account given by the pilot of the Republic, as he was about clearing his slip on the New York shore he was obliged to stop to allow the steam-boat Superior to go up the river just in front of him. As she passed him he saw the ferry-boat Alaska about 600 feet up river, off Market street, coming nearly directly down river, but heading a little to the westward, and estimated to be about 300 feet off the New York shore, and the Garden City, as the pilot estimated, about six or seven lengths—that is, about 900 feet—astern of the Alaska, and nearly in her wake, but about half a breadth further out in the river. He testified that as the Superior passed him he gave one whistle, intended for both the Alaska and the Garden City, which, the pilot says, was replied to with one whistle by both; that he then went ahead; that the Alaska slowed and stopped, passing astern of him; that the Garden City, instead of stopping or slowing, sheered out into the river when about five or six lengths off—i. e., about 700 feet—and blew two whistles; that he then stopped his own engines, but did not blow any whistle in reply to this signal of the Garden City; that then the Garden City stopped her engines; that he then started ahead, and blew one whistle simultaneously, being then about a length from the Garden City, and that the latter thereupon started ahead, blowing two whistles; that he then stopped and backed until the collision; that he was obliged to go ahead in order to get out of the way of the Alaska; that there was not room to swing round up river and go between the Alaska and the Garden City; and that the collision was about 300 feet off the New York shore, or at least not more than one-quarter across the river.

The pilot of the Garden City testifies that he was about 100 feet further out in the river than the Alaska, and considerably astern of her; that he heard the signal of one whistle from the Republic and the Alaska's reply of one whistle; that he did not understand that signal to be intended for him, and gave no whistle in answer to it, and that he did not blow one whistle at all; that when about off pier 37 or 38, and some 500 or 600 feet distant from the Republic, and five or six seconds after her one whistle, he gave her a signal of two whistles and immediately starboarded his helm, to which the Republic made no reply; that four or five seconds afterwards, and after passing about another length, and when off pier 37, he blew two whistles again, and at the same time stopped and backed, and kept backing with his helm to starboard till the collision; that the Republic did not, after she had signaled the Alaska, make a stop, as alleged, and then go ahead a certain time with one whistle; that he himself

did not, as alleged, go ahead after stopping and backing; that the Republic did not whistle at all after her first whistle to the Alaska; that under his own reversed engine he got seven or eight turns backwards, and would probably have been entirely stopped by another turn; that when he blew his second two whistles and stopped and backed off pier 37, the Alaska was about half a length out and away from the slip, and about 300 feet from him, and that the Republic was also about 300 feet from him, and nearer the New York shore, heading a little up river; that the usual course of the Catharine-street ferry-boats at that time of tide was to come out from the slip under a starboard helm and go up the river, swinging within a space of about 300 feet.

The other witnesses called upon each side, though differing in some details, generally corroborate the account given by the respective pilots, as above stated, the greater number of experienced nautical men being undoubtedly on the side of the libelants. The pilot of the Alaska states that the Garden City was about 400 feet astern of him when the Republic's one whistle was given, and about 50 to 75 feet further out in the river; that the Republic passed from 200 to 300 feet ahead of the Alaska; that she could not have swung round so as to go, as the Superior did, between the Alaska and the Garden City; and that the latter might have avoided the collision by slowing and backing, as the Alaska did.

Without considering more minutely the differences in the accounts given by the respective parties, nor relying much on the various estimates of distance given, it seems to me clear that the chief responsibility for this collision must rest with the Garden City, and that there are several distinct faults with which she is chargeable.

1. There were no such obstructions as to prevent the application of the ordinary rules for the navigation of the East river. The Garden City in coming down had the Republic upon her own starboard hand; the latter was seen in sufficient time for the Garden City to avoid her, and, by the statutory rule, the Garden City was therefore bound to keep out of the way, leaving the Republic free to keep her course. The evidence, as it seems to me, leaves no doubt that had she slowed and backed, as the Alaska ahead of her did, there would have been no difficulty. The two vessels being in the fifth situation, the ordinary course required of the Garden City by the inspectors' rules was to pass to the right; that is, astern of the Republic. There was no controlling reason compelling her to adopt the exceptional course of going to the left and attempting to cross the bows of the Republic. This departure from the ordinary rule was clearly the primary cause of the collision; and where such departures are not called for by any controlling necessity, and are adopted upon the mere option of the vessel bound to keep out of the way, they ought to be held to be at the peril of the vessel adopting them, un-

less it appears that, notwithstanding such departure, the collision was brought about solely by the fault of the other vessel. *The Chesapeake*, 5 Blatchf. 411; *The St. John*, 7 Blatchf. 220. That cannot be held to be the case here, notwithstanding the fault of the Republic in not answering the signal of two whistles, because I am satisfied that had the Republic kept her course without stopping, as she was entitled to do, whatever be considered her course, whether straight across the river as then headed, or swinging up the river as customary, the collision could not have been avoided, and that the only way of avoiding it, after the Garden City's two whistles and starboard helm, was by the Republic's stopping and backing, which the Garden City had no right to impose upon her.

2. While the inspectors' rules recognize (page 38) circumstances in river and harbor navigation in which "for good reason the pilot may find it necessary to deviate from the rule requiring him to go to the right," they also require that in such a case he shall give *"early notice* of such intention by two blasts of the steam-whistle." Except in some exigency of navigation which did not exist here, no notice can be considered early or timely, on the part of a vessel which is bound to keep out of the way, that would require the other vessel to stop in order to prevent a collision, for if this were allowed, then the vessel bound to keep out of the way would, in effect, reverse the obligation of the statute, which provides that she shall keep out of the way and that the other shall keep her course. The former, in effect, would be dictating to the latter, and compelling the latter to stop and give way contrary to the statute, which declares that the former is the vessel which shall keep out of the way of the latter. The notice then must be so timely as not to require the other boat to stop. There may plainly be special circumstances in river navigation where this rule would not apply, as where a boat is coming down with the tide and another is coming out of a slip too near to be avoided by going astern of her; and so in various other circumstances which might be instanced. The rule referred to applies only to ordinary navigation where there is no obstruction and nothing to prevent the vessel bound to keep out of the way from doing so, and giving time by signals as to her proposed course. The signal of two whistles given by the Garden City I must hold, was not in this case such early and timely signal as is required by the inspectors' rules, because, in the situation of these two ferry-boats at that time, I regard it as impossible for the Garden City to have avoided the collision by going to the left unless the Republic stopped and backed. As the Garden City could not require this of the Republic, so long as she could herself keep out of the way of the Republic by slowing and going to the right and allowing the Republic to keep on in her course as she had a right to do, it follows that under these circumstances her signal was too late, and that the time had already passed when the Garden City might lawfully go to the left, of her own option, inde-

pendent of any assent of the Republic, and that the Garden City was in fault for attempting to do so.

3. Again, there being no necessity for the Garden City to go to the left, and the signal of two whistles being given too late as the exercise of a positive right to cross the bows of the Republic, since that would have compelled the Republic to give way, that signal was lawful at the time it was given only as a proposition or request to the Republic to be allowed to pass to the left by the latter's aid and consent. The pilot of the Garden City had no right, therefore, to starboard his helm immediately on giving the signal, as the evidence shows that he did, before receiving an assenting response from the Republic. This was in effect dictating the course of the other vessel and depriving her of the right of way to which she had the superior right, under penalty of collision if she failed to yield. Until the Republic assented to this exceptional course, as proposed by the signal of two whistles, the Garden City had no right to act upon it. Her doing so manifestly contributed to the collision, and, upon this ground, as well as the others, she must, therefore, be held responsible. *The Johnson,* 9 Wall. 146, 155; *The Milwaukee,* 1 Brown, Adm. 313, 325; *The Delaware,* 6 Fed. Rep. 198; *The Franconia,* 3 Fed. Rep. 397, 401, 403; *The Hudson,* 14 Fed. Rep. 489.

While the primary responsibility for this collision rests upon the Garden City, for the reasons above stated, the Republic seems to me as plainly chargeable with violation of the inspectors' rule, which required her to "answer promptly" the signal of two whistles given by the Garden City proposing her exceptional course. These rules, enacted in conformity with section 4412 of the Revised Statutes, are of binding obligation. The supervising inspectors were authorized to frame these rules in consequence of more particular provisions, and more exact information being required by pilots in regard to each other's movements in rivers and crowded harbors than the ordinary rules of navigation afford. Nowhere is the need of these rules more urgent and an observance of them more essential than in navigation about this port. In the case of *The B. B. Saunders,* 19 Fed. Rep. 118, I have recently held it a fault to maneuver in accordance with a signal before answering it. The Republic in this case did not answer either of the two signals of the Garden City. Having disobeyed this rule, to avoid being charged with responsibility, the burden of proof is upon the Republic to show that her failure to reply could not possibly have affected the result. *The Pennsylvania,* 19 Wall. 125, 137. The libelant's counsel urges that this did not affect the result because the boats were already so near to each other that a collision was then inevitable. This contention seems to me not sustained by the evidence; and it is also attended by considerable improbability. The evidence shows that there were two signals given by the Garden City of two whistles each, besides several toots indicating danger. The pilot of the Garden City testifies that he had given no previous signal of one whistle to the Republic; so that, ac-

cording to his testimony, his first two whistles were the first signal given by him to the Republic. Now, it is certainly highly improbable that a pilot of any experience or sense of responsibility, such as the pilot of the Garden City certainly was, would give a signal proposing to cross the bow of a ferry-boat for the first time when he was so near to her that a collision was inevitable; and the improbability is still greater if he had previously agreed to go to the right by a signal of one whistle. The testimony of the pilot of the Republic, moreover, is to the effect that the Garden City stopped at some time after her first two whistles, whereupon he started his own engine ahead, and that he might, as he thinks, have thus cleared the Garden City, if the latter had not again started ahead under two whistles. The engineer of the Republic testifies that under this, her last, headway she made about six revolutions. This must have carried her forward some considerable distance. The two vessels were approaching each other nearly at right angles, and as they collided at the bows, and both boats were then almost stopped, a very little less forward motion on the part of the Republic would clearly have prevented the collision. These considerations, as it seems to me, prove conclusively that when the two whistles of the Garden City were first given, the situation and heading of the boats could not have been such as to involve any necessity of a collision. The situation was not *in extremis*, as in the case of *The Chesapeake, supra*.

Nor can it be said that the failure of the Republic to answer the first two whistles of the Garden City did not result in contributing to the collision, because she at once stopped her engines, assuming it to be true that she did so; for there is no question that her failure to respond led the Garden City, after going about a length, to repeat her signal, and at the same time to stop and reverse her engines. Even this signal was not responded to; for the Republic, according to her own story, then went ahead, and, in doing so, as stated above, collided gently with the Garden City. Had the Republic intended to keep on at all after the Garden City's first two whistles were given, considering that this would, as I find, and as the libelant's witnesses testify, have involved danger of collision, she should have replied to that signal promptly with one whistle, showing her dissent; and, in that case, the pilot of the Garden City would have known of the dissent and that he must reverse at once, as he did afterwards, instead of waiting for a reply until he had gone a length ahead, when his signals were repeated, and when he did commence to back. This difference of time in backing was of itself sufficient to have prevented the collision, and was the direct result of the Republic's failure to respond with one whistle if she did not intend to accede to the course proposed by the Garden City. If, on the other hand, the Republic did intend to assent to the signal of two whistles, and to give way to the Garden City, as it would seem that she did intend, from the fact of her stopping, if the account given by her pilot be correct, then she was equally bound to reply "promptly," so as to permit the Garden

City to go ahead confidently and without stopping. Had such assenting response been given and the Garden City allowed to continue going ahead, instead of backing, the Republic stopping meantime, as her pilot says she was then stopped, the collision could not have happened. I have much doubt, however, as to this part of the account given by the pilot of the Republic. The story of the pilot of the Garden City seems the more natural and probable. This part of the case shows evident embarrassment and confusion, occasioned by the failure to respond to the signals, as required; and such failure has been repeatedly held to be a fault. *The Clifton*, 14 Fed. Rep. 586; *The Grand Republic*, 16 Fed. Rep. 424, 427; *The Beaman*, 18 Fed. Rep. 334; *The B. B. Saunders, supra.*

The Garden City ran in connection with railroad trains, and it was a natural and lawful purpose to make good time and as few stops in navigation as possible. Her pilot had a right, also, to take into consideration the usual practice of ferry-boats to swing to the northward on coming out of their slip at that time of the tide. While neither of these considerations, nor both combined, could furnish any justification for any disobedience or neglect of any rule of navigation, general or local, nor authorize the Garden City to cross the bows of the Republic without the consent of the latter, unless she could do so without compelling the Republic to stop, they did furnish good and sufficient reasons for proposing to pass to the left, which her pilot evidently supposed would accommodate both, and required the Republic to answer promptly under the inspectors' rules.

Nor can I find any justification for the Republic's going ahead in the manner stated by her pilot, if his account in that particular be correct, after he had once stopped, on hearing the Garden City's first two whistles. For the Republic must then have been to the westward of the Garden City's course; under her six revolutions ahead the Republic must have made a considerable distance to the eastward, so that whether the Garden City went ahead or backed, it was the last movement ahead by the Republic which immediately contributed to the collision, and it could not have happened without that. The Garden City was, doubtless, already in fault, for the reasons I have stated above; and her fault was apparent, at least, to the pilot of the Republic; but this did not dispense with the use of all reasonable means and nautical skill on the part of the Republic to avoid a collision, notwithstanding the existing faults of the Garden City; and the danger of collision was then so evident that both alike were bound to keep away from each other. *The C. C. Vanderbilt*, 1 Abb. Adm. 361, 364; *The Vim*, 12 Fed. Rep. 906, 914, and cases cited.

For these reasons the Republic must also be held in fault, and the damages to her, less the damages to the Garden City must be apportioned between the two. The libelants are entitled to a decree accordingly, with costs, with an order of reference to ascertain the amount, if the parties do not agree.