## THE WILLIAMSPORT.

### THE PLYMOUTH.

(District Court, E. D. Pennsylvania. February 3, 1909.)

### No. 30.

COLLISION (§ 61*)—STEAM VESSELS WITH TOWS MEETING—FAILURE TO ALLOW SUFFICIENT ROOM FOR PASSING TOW.

A collision occurred at night in the channel east of Pollock Rip Shoal off the coast of Massachusetts between the steamer Williamsport, going north with a tow, both loaded with coal, and the second one of three empty barges bound south in tow of the tug Plymouth. The tug Piedmont, also with three tows, was in advance of the Plymouth and a little to the eastward. Each vessel saw the lights of the others, and when the Williamsport reached the north and south channel from the west at Pollock Rip Lightship, nearly a mile south of where the collision occurred, she received a signal from the Piedmont to pass starboard to starboard, which she accepted, and kept as close to the west side of the channel as she safely could. In this arrangement the Plymouth apparently acquiesced and passed to the eastward of the Williamsport, as did her first tow, but the second, apparently influenced by the ebb tide, which set strongly to the westward, swung across the course of the steamer and struck her port bow. *Held*, that the Williamsport was not in fault in taking the left side of the channel under the circumstances, but that the collision was due solely to the fault of the Plymouth in failing to give sufficient room to allow for the effect of the tide on her tow, which was 3,800 feet long; and especially in view of the fact that after the collision, which parted her towline, instead of standing by to give assistance, she proceeded 11 miles before anchoring her one remaining tow, which was wholly unnecessary, and then returned to the place of collision after the Williamsport had sunk and her tow had stranded, which, under Act Sept. 4, 1890, c. 875, § 1, 26 Stat. 425 (U. S. Comp. St. 1901, p. 2902), raised a presumption that her fault caused the collision.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 61.*]

In Admiralty. Suit for collision. On final hearing.

James F. Campbell, for libelant.

James J. Macklin and De Langel Berrier, for respondent.

J. B. McPHERSON, District Judge. This is a libel to recover damages for a collision which occurred about 20 minutes before 1 o'clock in the early morning of April 11, 1902, between the steamship Williamsport, of which the Philadelphia & Reading Railway Company was the permanent charterer, and the middle barge in a string of three that were being towed by the tug Plymouth, of which the Central Railroad of New Jersey is the owner and claimant. The facts are as follows:

The Williamsport is a steamship of about 910 tons register, hailing from the port of Philadelphia. Upon the night in question she was bound north on a voyage from Philadelphia to Portland, Me., and had in tow the Paxinos, a barge of 1,550 tons capacity, on a hawser 900 feet long. Both the Williamsport and the barge were loaded with coal, the steamship carrying 1,454 tons and drawing about 16½

feet, and the barge carrying a full cargo and drawing as much water as the steamship. The Plymouth is a large steam tug, 135 feet long and 27 feet beam, and was bound from Boston to Pt. Johnson, N. J. She was towing three empty barges in tandem fashion, barge No. 10 being next to the tug, No. 8 second in line, and No. 7 in the rear. The total length of the tug and tow was about 3,800 feet, or nearly three-fourths of a mile. The collision occurred to the east of Pollock Rip Shoal, off the coast of Massachusetts, and the surroundings will appear by inspection of the accompanying diagram, which is taken from Eldridge's Chart C, published in 1902:

The vessels came together at the Gas buoy, and the blow was delivered by the starboard bow of barge No. 8 upon the port bow of the Williamsport, about 20 feet abaft of the stem, making a hole 6 to 8 feet long, which extended below the water line. There is little, if any, dispute concerning the maneuvers of the vessels, except just before the collision. The night was dark and cloudy, but there was no difficulty in seeing lights, and it is certain that the Williamsport and Plymouth were aware of each other's presence before the Plymouth had reached Pollock Rip Shoals lightship, and while the Williamsport

was several miles distant at Shovelfull lightship. Each was displaying towing lights that indicated (in accordance with article 3 of the Inland Rules) that the length of the tow exceeded 600 feet. There was another tug and tow in the immediate neighborhood, whose presence and maneuvers are of the utmost importance in this controversy. This was the Piedmont, which was bound south for Baltimore, towing a string of three barges, of which the length was about equal to the Plymouth's string, and also displaying the proper towing lights. The Piedmont was in front of the Plymouth at some distance to the southeastward, the space between the Plymouth and the rear barge of the Piedmont's tow being probably a quarter of a mile. The presence of the Piedmont and her tow was well and seasonably known both to the Williamsport and to the Plymouth. There is no dispute concerning the efficiency of the lookouts or the adequacy of the crews upon any of the vessels. As will be seen upon the diagram, the three tows were approaching each other nearly at right angles, the apex of the angle being Pollock Rip lightship. (In reading the testimony, this is to be distinguished from Pollock Rip Shoals lightship, which is 4½ miles to the north.) The Williamsport reached the apex first, and changed her course at that point, rounding buoy No. 2 and leaving the lightship on her starboard 'side. Her red light had been seen by the Plymouth along the course from Shovelfull lightship, but now, as the Williamsport turned to the north, the latter vessel first showed both lights, and after a short interval shut out the red and showed the green light alone. This necessarily meant that she was proceeding up the western side of the channel, or slue, which at this point for vessels of her draft is about three-fourths of a mile in width. Under ordinary circumstances she would have been taking the wrong side of the channel, and the Williamsport, recognizing that she is called upon to justify her position, offers the following explanation, which in my opinion is fully established by the evidence: As she changed her course at the Pollock Rip lightship, or very soon afterwards, she saw the red and green lights both of the Piedmont and of the Plymouth. The Piedmont was directly ahead, and the Plymouth was a little farther to the westward. In the darkness it was impossible to tell with accuracy how distant the last barge of the Piedmont's tow was from the Plymouth's bow, and I see no reason to doubt the truthfulness of the statement made by the Williamsport's master, that the Piedmont's last barge seemed to him to be nearly abreast of the Plymouth. Neither do I see any reason to doubt the testimony of the Plymouth's master, that the distance between his tug and the last barge of the Piedmont's tow was in fact about a quarter of a mile toward the southeastward, although I do not think that the discrepancy between the two statements is of vital importance. When the Williamsport changed her course to the north, the Plymouth must have been at least two miles away. The collision took place at the Gas buoy, which, according to the scale on the chart, is three-fourths of a mile north of the lightship, and the ebb tide was running at about two knots toward the southwest. The tide was therefore with the Plymouth, and her speed was no doubt several knots more than two, while the speed of the Williamsport and her barge, both

being heavily loaded and having the tide against them, probably did not exceed two knots over the bottom. As the Williamsport had passed the Gas buoy before she was struck, going certainly not half as fast as the Plymouth, the distance between them when the Williamsport turned north at the Pollock Rip lightship could not have been less than two miles, and was probably more.

It is here—at or shortly after the Williamsport's turn—that the action of the Piedmont becomes so important. She was the foremost of the two tows that were bound south, and naturally took the initiative in signaling to the approaching vessel. The signal she gave was two blasts, perhaps repeated once or twice, but at all events the signal was distinctly given and was heard both by the Plymouth and by the Williamsport. Now, if it be true, as the master of the Plymouth testified, that he was well over on the western side of the slue—he says that he passed about 550 feet east of the Gas buoy, but the distance was clearly much less—he must have known that if the Piedmont's signal was accepted the Williamsport would be forced to the extreme western edge, unless he himself went to the eastward, so as to give her as much room as possible. It may perhaps be true that the master of the Williamsport was not absolutely bound to accept the Piedmont's proposition to pass to starboard; but it cannot be doubted that if he did not accept it, if he crossed the signal, he would take the risk of what might happen afterwards, and would almost certainly be adjudged at fault if a collision should occur. The Piedmont's motive in taking the initial step and offering to pass to starboard can only be conjectured. No one from that vessel was called as a witness, and there is therefore no direct testimony on the subject; but it does not seem unlikely, with the tide setting toward Pollock Rip, that she preferred to have the Williamsport take the risk of the western position, rather than to take it herself. At all events, whatever her reason may have been, she did force the Williamsport to that side of the slue, and the Plymouth acquiesced in the maneuver. The Williamsport accepted the Piedmont's signal promptly, as she was bound to do, and she was justified in assuming that the Plymouth agreed to the proposition, for she received no contrary signal from that vessel. If, as the Plymouth's master now says, there was abundant room between his tug and the last barge of the Piedmont's tow to admit of the Williamsport crossing his bow after she had passed the Piedmont's tow, he should have signaled the Williamsport to that effect, proposing that he and the Williamsport should pass port to port. But he made no such signal, and I think it can hardly be doubted that such a maneuver would have been extrahazardous, and that he can hardly be serious in suggesting it as an easily feasible course. In my opinion, therefore, the Williamsport was practically compelled to accept the Piedmont's proposition to pass to starboard, and was justified in believing that the Plymouth was also in accord upon this subject. She was also justified in expecting that both the approaching tows would bear to the eastward, so as to give her as much room as possible on the western side of the channel, especially as there was plenty of water to the east, and as the tide was setting strongly to the west and was thus increasing her danger of running

upon the Rip. She carried out her part of the maneuver to the best of her ability; she starboarded her helm promptly and repeatedly, and changed her course to the westward until she was as far over as it was prudent to go. She passed the Piedmont and her tow safely, and also passed safely by the Plymouth and her first barge, but the second barge, No. 8, was carried by the tide, aided perhaps by a sheer of the barge, so far over toward the edge of the slue that the Williamsport struck the hawser between the two barges, thereby swinging her own head and the head of the second barge somewhat to the eastward before the hawser parted, and exposing herself to the blow from which the damage resulted.

The Plymouth's theory is that the Williamsport suddenly sheered to starboard after passing the first barge, and that this sheer was the sole cause of the disaster. To my mind the theory is not credible. It requires the court to believe that a heavily loaded vessel, towing a heavily loaded barge, and moving slowly against the tide, would suddenly sheer a considerable distance while moving less than 1,000 feet. I say while moving less than 1,000 feet, because of course the Plymouth's barges were also moving to meet her with comparative rapidity, and the second barge must therefore have inflicted the blow before the Williamsport had gone more than 500 or 600 feet at the most beyond the point where she passed barge No. 10. It seems to me much easier to believe, and it accords quite as well with the testimony, that an empty barge, going at a higher speed and acted upon by a westerly tide, should inevitably tend still further in that direction, and might easily get out of line in the darkness without her deviation being accurately observed. This, of itself, would account for the collision. If she sheered also, the explanation is even more satisfactory. I think, therefore, that the Plymouth was solely at fault because she failed to give the Williamsport sufficient room to execute the maneuver of passing starboard to starboard, to which the Plymouth herself agreed. There is no doubt in my mind that there was plenty of space and depth for the Plymouth to have gone sufficiently to the eastward to have allowed the Williamsport to pass with safety; and the fact that she did not do so is, I think, to be attributed to a disinclination to take the necessary trouble, and to a willingness that the Williamsport should encounter the risk of the shoal. I do not mean that she deliberately and willfully crowded the Williamsport to the point where the collision occurred; but I do mean that, as she had ample notice that the tows were to pass starboard to starboard, and as she could easily have given more room to the approaching vessel to execute the maneuver in safety, she was at fault for not doing her part to afford the proper margin. She was bound to take account of the facts that her barges were light, and that the tide was setting strongly to the westward; these reasons only made it more imperative that she should do all that lay in her power to diminish the risk to which the Williamsport was undoubtedly exposed, even under the most favorable circumstances. To say the least, the Plymouth was negligent, and it may also be that she only made way grudgingly, instead of co-operating willingly toward the success of the maneuver to which she was herself committed.

I see nothing in the conduct of the Williamsport that was blameworthy. It is urged that she was at fault for disregarding article 25:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

If this slue is to be considered a narrow channel, it may be that if the Williamsport had originally proposed to pass in contravention of the rule (as was the case in The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751) she would have been to blame, but she did not make the proposition. This came from the Piedmont, was acquiesced in by the Plymouth, and, if passing to starboard was a fault, the Plymouth was equally to blame with the other vessels. But the Williamsport was confronted with a difficult situation. On the one hand, she was asked to accept the risk of a starboard course, and upon the other she was certain to be held at fault if she crossed the Piedmont's signal and disaster should result. It was so held in The Clifton (D. C.) 14 Fed. 586, and in The Orange, 64 Fed. 141, 13 C. C. A. 680, affirmed in 69 Fed. 848, 13 C. C. A. 680. Other cases throwing some light on the present controversy are The Garden City (D. C.) 19 Fed. 529; The Saunders (D. C.) 19 Fed. 118; The George L. Garlick (D. C.) 91 Fed. 920; The Nutmeg State, 67 Fed. 556, 14 C. C. A. 525; and The James Bowen (D. C.) 52 Fed. 510. The distance that separated the approaching tows from the Williamsport seemed to be ample to permit the proposed maneuver to be executed safely, and the distance was ample if the Plymouth had done her part and had taken her barges a few yards further to the eastward. She had a long and unwieldy tow, and was bound to use extreme care in order to avoid collision. The Samuel Dillaway, 98 Fed. 138, 38 C. C. A. 675; The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417, affirming (D. C.) 115 Fed. 378. Such care she failed to exercise, I think, and the result is chargeable to her negligence. The special circumstances are sufficient, in my opinion, to exonerate the Williamsport from blame.

The conclusion that the collision was solely due to the Plymouth's fault is re-enforced by another consideration. It appears by the uncontradicted evidence that, although the master of the Plymouth knew that the collision had taken place, he deliberately disobeyed the rule laid down by Act Sept. 4, 1890, c. 875, § 1, 26 Stat. 425 (U. S. Comp. St. 1901, p. 2902):

"In every case of collision between two vessels it shall be the duty of the master or person in charge of each vessel, if and so far as he can do so without serious danger to his own vessel, crew and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by collision, and also to give to the master or person in charge of the other vessel the name of his own vessel and her port of registry, or the port or place to which she belongs, and also the names of the ports and places from which and to which she is bound.

"If he fails so to do and no reasonable cause for such failure is shown, the collision shall, in the absence of proof to the contrary, be deemed to have been caused by his wrongful act, neglect or default."

Instead of standing by the Williamsport, the master of the Plymouth proceeded without stopping and took his remaining barge to a point three miles northwest of the Handkerchief lightship—which is nearly five miles southwest of the Shovelfull lightship—and anchored her there, returning afterwards to the scene of the disaster. This, I think, was extraordinary conduct. The chart shows distinctly that there was plenty of suitable anchorage ground in the immediate vicinity of Pollock Rip lightship, where the barge would have been entirely out of the course of other vessels. This ground could have been reached in a short time, and the Plymouth would then have been free to discharge her statutory duty. But she chose to take the unusual step of towing the barge a distance of about 11 miles before bringing her to anchor, without any reasonable cause for such a proceeding. She did not return until daylight, several hours after the collision, and by that time the Williamsport had drifted to the northwest of the Gas buoy, and had sunk. Her crew had taken to the boats, and were on board the Pollock Rip lightship, while the Paxinos was aground on the shoals some distance away. It may be that the Plymouth would not have been able to render much assistance if she had stayed in the neighborhood of the distressed vessels, but this is not a sufficient excuse for her failure to perform a clear duty. She did not know what help might be needed, and did not make the slightest effort to discover. For all she knew, the lives of a crew might be in peril, but she deliberately left them to take their chances, while she pursued a leisurely voyage to a distant anchorage. It is not easy to explain the master's conduct except upon the theory that he desired to use up the hours until daylight should come, and should thus put his own safety beyond doubt.

Of course, as was said in Boston Towboat Co. v. Winslow, 76 Fed. 597, 22 C. C. A. 329:

"The duty of the master to stand by and to do the other things named in the statute is a qualified obligation. 'If and so far as he can do so without serious danger to his own vessel, crew and passengers' is the chief condition."

The court goes on to declare that the master—

"must, as well as he can in the emergency, regard and weigh existing conditions, and ought not to be held culpable for an error of judgment. The court's duty is to ascertain and consider the state of affairs under which he acted. It will not accept the excuse that, in his judgment at the time, the safety of his vessel and crew and passengers forbade his standing by, if the evidence shows that he hastily and recklessly, or without apparent necessity, slipped away, or willfully concealed facts he was bound to disclose. He must act with the coolness and courage demanded by his position and rank, and must be inspired with an active sympathy for those who are in peril and distress. If he has shown proper care and spirit in forming his judgment, he ought not to be condemned because another would have acted differently, or because later developments show that he was too cautious."

So, also, in The Hercules, 80 Fed. 1001, 26 C. C. A. 304, the Court of Appeals of the Fourth Circuit held as follows:

"We construe this statute to mean that, if a master of a vessel that has been in collision with another fails to stay by her and shows no reasonable cause for such failure, the law will presume that the collision was caused by some negligent act or omission on his part, and, in the absence of proof to

the contrary, will fasten upon him the responsibility of the collision. It puts upon him the burden of showing that he was free from fault. It assumes that one who fails to offer assistance to those whose distress is caused by him is presumably at fault in the act which caused the distress, and it denounces pains and penalties against his inhumanity, and holds his ship responsible for the pecuniary fine; but it does not condemn without a hearing. The obligation imposed is not unqualified; it is carefully guarded by conditions; it permits presumptions to be rebutted by proofs, and it is 'only in the absence of proof to the contrary' that his responsibility is made absolute."

In other words, the presumption of fault arises where there is an unexplained failure to stand by. But this presumption is not conclusive; it may be rebutted by sufficient proof to the contrary, although it shifts the burden to the offender, and in a doubtful case is sufficient to determine the controversy. In the present situation, the presumption is not needed; the evidence shows, I think, that the Plymouth was at fault; but the correctness of this conclusion is certainly strengthened by the unreasonable conduct of her master.

A decree may be entered in favor of the libelant, with costs.