## THE H. M. WHITNEY.

### HARRIS v. METROPOLITAN S. S. CO.

### METROPOLITAN S. S. CO. v. HARRIS et al.

(Circuit Court of Appeals, Second Circuit. March 2, 1898.)

Nos. 75 and 76.

1. COLLISION—LIBEL—VARIANCE BETWEEN ALLEGATIONS AND PROOF.

Under a libel charging that a vessel was towed in a fog too rapidly, the admission of evidence on the theory that she should have anchored is not sufficient ground for reversal, where the respondent was not surprised, and was given opportunity to, and did, answer the evidence.

2. SAME—LONG TOWS—EXTREME CARE REQUIRED.

However great a menace to navigation the use of public waterways by long tows may be, the courts will not forbid it as long as it is allowed by the authorities who regulate navigation; yet they will hold those who do so to a degree of care commensurate with the increased risk.

3. SAME.

During a dense fog, a tug towing two barges on hawsers of 70 to 80 fathoms each, making a fleet extending more than a quarter of a mile, started through Vineyard Sound, and was about to enter Pollock Rip Slew, a dangerous place, by reason of its shoals, tides, narrowness of channel, and changes in its course. As she was about to enter the slew, she passed a steamer which could be dimly seen through the fog. The steamer had stopped her engines, but started again as soon as the tug and first barge passed, and hove her wheel to port, so as to converge on the course over which the tug and first tow had passed, and ran into the second barge, about 450 feet behind the first. It was the general practice of those towing over that

route to tow more than one barge. *Held*, that the tug and tow were at fault in not going to anchor until the weather cleared, instead of entering the slew, and that the steamer was also at fault in not waiting a reasonable time before starting up her engines and porting, and that, having got out of the slew, it was not dangerous for her to wait with engines stopped. 77 Fed. 1001, affirmed.

### Appeals from the District Court of the United States for the Southern District of New York.

In these causes cross libels were filed in the district court, Southern district of New York,—one by the owners of the barge Shamokin and the tug International, to recover damages for the sinking of the Shamokin while in tow of the tug, by a collision with the steamer H. M. Whitney; and the other by the Metropolitan Steamship Company, owners of the H. M. Whitney, against the libelants in the first cause, to recover the damages which the H. M. Whitney sustained in the collision. The district court found both parties in fault, and divided the damages. From the decrees making such disposition of the causes, both sides have appealed. The following excerpts from the opinion of the district judge, supplemented by some findings of this court, sufficiently indicate the general circumstances attending the collision. Most of these statements are undisputed, and, as to the others, they are supported by a clear preponderance of proof: "The Shamokin was a large barge, 186 feet long; * * * carrying capacity, 1,450 tons. She was loaded with coal, and was employed in transportation between Philadelphia and Boston. At the time of the collision, she was astern of a smaller barge ahead of her (the Hercules), which was attached to the International by a hawser of some 70 or 80 fathoms; and a hawser of similar length attached the Shamokin to the Hercules. The fleet, which was over a quarter of a mile long, was overtaken by fog the evening previous, and was anchored through the night to the northward and westward of Handkerchief Lightship. At about 2 p. m. of June 26, 1894, the fleet got under way to go through Vineyard Sound; but it was * * * obstructed by fog, and, when halfway between Shovelful Lightship and Pollock Rip Lightship, the fog became dense"; a wet, dense, black fog, the master of the Shamokin calls it. Before that time, however, the fog had become thick. No one on the fleet could see Shovelful Lightship, although they passed it within 200 to 300 feet. "The course in approaching Pollock Rip Lightship is E. by S., ¼ S." When the fog changed, as the master of the Shamokin describes it, from a thick, white, dry fog to a dense, wet, black one, "the fleet was within range of the fog signal of the Pollock Rip Lightship. The tug sounded the regulation signals of three blasts at regular intervals, indicating that she had a tow. The tug was proceeding at the rate of about three or four knots over the land, the tide at the time setting westerly and southerly. At Pollock Rip Lightship the course changes 5½ points to the northward, viz. to N. E. ¼ N. The Whitney, approaching in the opposite direction, and heading to the southwest, heard the tug's fog whistle, and gave the tug a signal of two blasts, which was accepted and answered with two by the tug. * * * At that time neither was seen by the other. * * * The tug [had] previously rounded the lightship." The libel of the Shamokin puts the tug on a course N. E. when the International heard the fog signal of the Whitney, and the evidence makes it at least that, if not more northerly. "On the exchange of whistles, the tug starboarded until she headed N. by E. The Whitney starboarded one point until she headed S. W. by S. The tug and steamer were [barely] visible to each other as they passed at a distance variously estimated at from 100 to 300 feet, probably at least 200 feet. The Hercules, the first barge astern of the tug, was [dimly] seen, when she was passed by the Whitney; and those on her in like manner saw the Whitney." The libel and answer of the Shamokin both assert that the Whitney and the Hercules passed at about the same distance from each other as did the Whitney and the tug; and the evidence abundantly supports that allegation. "Soon after the Hercules was passed, the Whitney, seeing no other tow, started up her engines, and ported. * * * Almost immediately after porting, the Shamokin was seen not 100 feet distant, crossing the bows of the Whitney from port to starboard. The Whitney reversed, but collision was then inevitable. She struck

the Shamokin at an angle variously estimated from 4½ to 7 points, causing damage to both vessels. * * * The Shamokin sank in a few minutes; * * * a total loss of the barge and her cargo."

Robt. T. Benedict, for Metropolitan S. S. Co.
Wilhelmus Mynderse, for Harris and others.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts). Each side charges faults against the other, which the district judge did not sustain; and in some of his conclusions we are not able to concur. Discussion of these branches of the case, however, may be omitted here, since we find sufficient in the record to sustain the decrees below against both vessels.

The first question to be considered is as to the alleged fault of the tug and tow in navigating in that locality at that time in the way in which they did. The libel of the Whitney charges fault, "in that the Shamokin was being towed at too rapid a rate of speed in such a fog; in that those on said barge [and on the International] took no measures to indicate that she was being towed by said tug." The language of this charge, interpreted with absolute literalism, may be held to cover a contention that the speed of the fleet should have been reduced to zero; i. e. that it should have anchored, although the ordinary and natural import of such language is not so extensive. Still, there has been no "surprise," nor has the fleet been embarrassed in giving its testimony, or lost any of its witnesses by relying on the more natural construction of the libel. The testimony of the Whitney bearing on its contention was introduced early in the case. There was abundant opportunity to answer it, and it was answered. The district court has found the fleet in fault for not anchoring, and it would seem hypercritical to reverse because the phraseology of the libel does not charge in clearer language the particular fault as to which evidence was introduced by both sides, and full argument had both in the district court and here.

The opinion of the district judge says:

"Considerable testimony was given * * * to the effect that navigation in dense fog in Vineyard Sound, and particularly around Pollock Rip Lightship, was highly dangerous, and that the tug and tow might easily have anchored in a safe place before reaching the lightship. Though there was some contradiction in the evidence on this latter point, I am persuaded from the affirmative testimony, as well as by consulting the chart, that the tug would have found no difficulty whatever in anchoring in a perfectly safe place had she desired to do so, before rounding Pollock Rip Lightship."

The first of these propositions is hardly disputed. Certainly, all the witnesses agree that, by reason of the shoals, the eccentricities of the tide, the narrowness of the channel in places, and its changes of course, the stretch from south of Shovelful to the Whistling buoy, beyond Pollock Rip Slew, is, during a thick fog, an extremely dangerous piece of water to pick one's way through; "in a dense fog or a dark night, as dangerous as any place between New York and Portland," says one of the witnesses. And, as to the second

proposition, the great preponderance of the evidence is with the district judge.

In view of the testimony, we are not prepared to say that the towing hawsers used by this flotilla were too long, nor that it is improper navigation to tow the barges "tandem," or to tow more than one at a time. That there cannot, even under the most favorable circumstances, be the same control exercised over such a flotilla as over a vessel moving under her own power, is self-evident. So, too, is the proposition that, the longer a vessel or a flotilla is, the more space she will require to maneuver in. Still, it is not for the courts to forbid the use of public waterways by long tows, however great a menace they may be to navigation, when the authorities whose function it is to regulate navigation in such waterways allow them. We had the question of towing on a long hawser through Hell Gate before us in The Josephine B., 7 C. C. A. 498, 58 Fed. 813, and held that, in the absence of any special regulations on the subject, the practice, which was shown to be a common one, was not to be condemned on the evidence there adduced. The court of appeals in the First circuit had the question of a single tow on a long hawser, and used this language: "It is beyond the province of the courts to condemn a practice so notorious and so long-continued that it must be presumed to be known to congress and to the supervising inspectors, and yet has not been condemned by either of them." The Berkshire, 21 C. C. A. 169, 74 Fed. 906. But there is a wide difference between condemning such a practice altogether and holding those who indulge in it to a degree of care commensurate with the increased risk which their indulgence in such practice entails. "While," as said in The Berkshire, "we cannot condemn a tow of the character of that in this case as absolutely unlawful, yet we must hold tugs which navigate this coast with such long and essentially hazardous fleets to the use of the extremest care in the interests of common safety." The Gladiator, 25 C. C. A. 32, 79 Fed. 446.

In the case at bar the entire flotilla was about a quarter of a mile in length. After rounding the lightship, and getting into the jaws of the slew, it would have to run for nearly a mile through a channel no wider than its own length, and in which the irregular and uncertain tides, as one witness expresses it, "follow the sun in a continual move, not running in any direct direction all the time." And in that narrow channel the chances were that other vessels westward bound would be encountered, for a heavy coastwise traffic passes through it. The tug would, of course, be unable to check the motion of any of its tows, or to give them, or some one of them, any sudden movement to port or starboard; and yet the tug might be exposed to a different tidal action from that which was affecting the last barge in tow. It is manifest that even in broad daylight careful steering by the whole flotilla might be required to make the passage in safety. Before they reached Pollock Rip Lightship, however, the situation, even on the statement of the Shamokin's own witnesses, was very far removed from broad daylight. No one on the International, the Hercules, or the

Shamokin saw Shovelful Lightship as they passed it some 200 to 300 feet away; nor did any of them see the Pollock Rip Lightship, though some of them made out the whiter color of the steam from her siren showing above the dark fog. No vessel of the three could see the other, and the only guide for the steersmen of each tow was the hawser leading over her bow to the vessel ahead. The master of the Shamokin testified that, after passing Shovelful Lightship, he couldn't distinguish the steam signals of the International. "The fog shut down thick. It run his signals together so that I couldn't count them. I couldn't tell whether he was blowing one long blast, two blasts, or three blasts." Even this indication as to any changes of course by the tug to port or starboard to avoid other vessels was lost from that time on to the steersmen of the tow. And at this time there was safe anchorage available. It was no doubt not an absolutely safe anchorage, but no place is absolutely safe on navigable water in a fog. There was enough water to the starboard of Stone Horse Channel for the tug and tow to withdraw into, out of the path of vessels navigating through the fog from the whistle on Pollock Rip Lightship to the bell on Shovelful Lightship, or vice versa. It might be that sailing vessels beating across the full width of the channel, in order to make to windward, were still to be encountered even on the anchorage; but, nevertheless, anchoring would reduce the whole number of vessels to be encountered. The speed of any sailing vessels thus encountered must have been low, for there was "very little air." And, once at anchor out of the main channel, their positions fixed, and no longer shifting, the signals they were required to give as anchored vessels would have announced their whereabouts to all who heard them, and reduced the risk of collision with others to a minimum. In view of these facts, we have no hesitation in holding the tug and tow in fault for going on into the slew, instead of anchoring until the weather improved. It was a hazard, which might fairly be undertaken by a vessel in control of her own motive power, picking her way cautiously along from whistle to bell, and from bell to whistle, and meanwhile announcing to all approaching vessels her exact whereabouts by fog signals whose meaning is well known. But for a tow a quarter of a mile long, navigated by three steersmen at equal distances apart, neither of whom could positively tell with any exactness what the other was doing, and with no signal to indicate where the tow ended, it seems to us to have been an extremely hazardous undertaking. To handle these long tows in that manner, hauling them through narrow and tortuous channels in such a fog as this, is a serious menace to the safety of navigation. Whether the navigators who undertake such experiment do or do not violate some particular provision of the sailing regulations, they certainly expose their fellow navigators to a greatly increased risk, unnecessarily; and for a collision resulting from such action they should be made to respond. Navigating in crowded waters, with essentially hazardous fleets, they should, in the language of the court of appeals in the First circuit, "be held to the extremest care." And certainly in the case at bar the care exercised was far short of "extreme."

The navigation of the H. M. Whitney remains to be considered. She was apprised of the presence of the International, and understood from her signals that she was towing. The Whitney did not know how many craft the International had in tow, but she was bound to assume that in all probability there was more than one. The evidence is overwhelming that it is the general practice of those who tow over this route to take more than one barge, and to tow them tandem. Having passed the International and the Hercules safely, and, as we find, on substantially parallel courses, and with engines stopped, the Whitney "started her engines ahead, and hove her wheel to port." Had it not been for this maneuver, we are satisfied the collision would have been avoided. The master of the Whitney testified that he waited after the Hercules passed until he supposed everything was all clear before he started up and ported. But his waiting must have been of the briefest, for, as he testified, he ran probably 20 to 30 seconds before he made out something ahead, and the Shamokin was only 450 feet behind the Hercules. Knowing that, in the ordinary course of events, another tow was to be expected, and having observed the distance at which the Hercules was towing behind the tug, the Whitney should have waited a reasonable time for the appearance of a possible second tow before starting up again, and changing her course, so as to converge upon that over which the tug and first tow had passed; and it seems quite plain upon the evidence that reasonable time was not allowed. There is a suggestion in the proof that it was dangerous for her to wait with engines stopped in this narrow channel, with its uncertain tides. There would be force in this suggestion if she were still in Pollock Rip Slew; but we concur with the district judge in the finding that she had got out of the jaws of the slew, into the more open water near the lightship. Her own evidence as to the direction from which she heard the whistle of the lightship at the time of collision seems to settle this question, as to her position, quite conclusively. We concur, therefore, with the conclusion of the district judge that the Whitney "was to blame * * * for not waiting a reasonable time before starting up her engine and porting."

The decrees appealed from are therefore affirmed, but, as both sides appealed, and no modification is made in the decrees, without interest or costs to either side.