## THE SAMUEL DILLAWAY.

### DELAWARE, L. & W. R. CO. v. DONNELL et al.

(Circuit Court of Appeals, First Circuit.   November 8, 1899.)

Nos. 269, 270.

1. COLLISION—VESSELS CROSSING—CARE REQUIRED OF TUG WITH TOWS—LOOK-OUTS.

A tug having three tows on a single line, covering altogether about 3,000 feet in length, is bound to use extreme care, in navigating the ocean at night, to avoid collisions, and may be required by the conditions to maintain a lookout aft as well as the regular lookout in the bow.   Such a tug will be held in fault for a collision of one of the tows with a sailing vessel crossing, which might have been, but was not, seen in time for the tug to have passed astern of her.

2. SAME—DETERMINING FAULT—EFFECT OF NEGLIGENCE.

Independently of the question whether or not the want of a proper look-out contributed to a collision, the fact of negligence in that respect neces-sarily weighs with great force against the vessel thus negligent in deter-mining questions of fact in dispute where the testimony cannot be recon-ciled.

3. SAME—ACTION IN EXTREMIS.

Where the testimony of the captain of a schooner which was sailing closehauled, and which was shown to have been properly manned, and to have kept a proper lookout, was to the effect that on approaching within an eighth of a mile of a tug, which, with tows, was crossing his course, his judgment was that, if he continued on his course, his vessel would come in collision with the tug, and the court was unable to say that, if the schooner had continued on her course, a collision would not have re-sulted, and the initial fault was that of the tug, the schooner will not be held in fault because, under such circumstances, she attempted to tack, and, through no fault in her navigation, came into collision with one of the tows.

Appeals from the District Court of the United States for the Dis-trict of Massachusetts.

Charles T. Russell and Arthur H. Russell, for appellants Delaware, L. & W. R. Co.

Edward S. Dodge, for appellees Albert H. Smith and William T. Donnell and others.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge.   This is a case of a collision occurring between 3 and 4 o'clock on the morning of October 28, 1895, between the schooner Samuel Dillaway, bound from Bath, Me., for a southern coal port, and the tug C. B. Sanford, having in tow three coal barges, bound from Boston for Hoboken.   All the vessels were light.   The collision occurred between Cape Cod and Nauset lights.   There was no difficulty arising from the condition of the atmosphere, and what-ever issues were at any time made with reference to the condition of the lights of the various vessels have disappeared from the case. The wind was strong, blowing about 15 miles an hour, and variable over three or four points of the compass between south and south-west.   The tow was in a common form on the New England coast,—

three barges in line behind the tug, with about 130 fathoms of hawser between each, and covering altogether about 3,000 feet. The tug and barges all belonged to the appellant. One of the barges—the Chemung—and the schooner were damaged by the collision. A libel was filed by the appellant, as owner of the tug and tow, against the schooner, to which an answer was put in by her master as claimant. Also a libel was filed by the owners of the schooner against the owner of the tug and barges, to which an answer was also duly filed. The pleadings in the first libel conform to the answer to the second, and the pleadings in the second libel to the answer to the first. The decrees in the court below were in favor of the schooner on both libels, and each appeal was taken by the owner of the tug and barges.

The appellant made a question at the hearing before us, based on the theory that the libel filed by the owners of the schooner was strictly a cross libel, involving the same issues as though filed against the Chemung or the tug, one of them alone or both jointly; but no assignment of error raised any question of that nature. If it had been otherwise, the proposition would have been futile, because the libel in behalf of the owners of the schooner was filed against the appellant for a marine tort, committed by its agents, whether they were the officers and crew of the tug or the officers and crew of the barge Chemung, or both sets of officers and crew jointly; and, there having been no application by the owner of the tug and barge for a limitation of liability, the proceeding under the second libel was strictly in personam.

The case in behalf of the appellant is stated in its libel as follows:

"The weather was clear and bright. The wind was moderate. Proper lights were set and burning upon the said tug and all of said barges. A competent man was on lookout, and one at the wheel. While so proceeding, and using every required and possible precaution to see vessels and avoid collision, the green light of the said schooner Samuel Dillaway was seen on the port about two points aft of the beam of the said towboat C. B. Sanford. As the said towboat was too far ahead to starboard her wheel and go across the stern of said schooner, she was slowed down, and her course changed to starboard, to allow said schooner sufficient room to pass. But the said schooner, instead of continuing upon her course, as she ought to have done, and might easily have done, either changed her course, or so carelessly maneuvered, that she struck the said barge Chemung on the port side abreast the mizzenmast. The said towboat and barges were proceeding at a rate of not over four miles an hour at the time that the light of said schooner was first seen. * * *

"All said loss and damage was caused solely by the negligence and fault of said schooner, and those in charge of her said navigation, in not avoiding and keeping out of the way of said barge, as she ought to and might easily have done, and such collision was not in any manner or degree caused or contributed to by the said barge or the said towboat, or those in charge of her navigation."

The case in behalf of the schooner, as stated in her answer to the libel against her, is as follows:

"The schooner Samuel Dillaway is a three-masted schooner. At the time of the collision she was bound from Bath, Me., light, to some southern coal port to seek a cargo. The weather was clear. The wind was strong and variable from south-southwest to south. For from twenty minutes to half an hour preceding the collision the claimant, who was then master of the schooner Samuel Dillaway, the second mate of the schooner, and two compe-

tent seamen were constantly on deck, one of said seamen being stationed forward, on the lookout, and the other at the wheel of the schooner. The schooner was closehauled on the port tack, heading about west-southwest. While thus proceeding, the two masthead lights of the towboat, which afterwards proved to be the C. B. Sanford, were seen by those on the schooner, about four points on the starboard bow of the schooner, and later the red light of the said towboat was also seen. The lights of the several barges in tow of the Sanford were also seen and noted by those on the schooner. Said schooner continued closehauled on the port tack, as she had been from the time when any lights of the Sanford had first become visible and been seen. But the towboat C. B. Sanford, with the barges in tow, continued to approach the schooner, finally showing her green light for a few moments to those on the schooner in addition to her red light, until the said towboat was within about one-eighth of a mile away, and on the starboard bow of the schooner, when the towboat shut out her green light, and showed her red light alone to those on the schooner. It then became evident to those on the schooner that it was the intention of those on the towboat to attempt to go across, and to attempt to tow the barges across the bow of the schooner; and it being then entirely apparent to those on the schooner that, if the schooner continued upon the course upon which she was then sailing, she would inevitably collide with the towboat or some of the barges, the claimant, master of the schooner, gave the requisite orders, and attempted to tack the schooner. The schooner, however, owing to the variable wind and to the sea, misstayed, fell off again, and struck the barge Chemung, sustaining some injury. After remaining in contact with the Chemung for some minutes, the schooner got clear of her, and the towboat Sanford, still proceeding on her course, towed the barge Chenango against the starboard quarter of the schooner, causing further injury to the schooner."

In addition to these statements of the positions of the various parties, we think but little need be said as to the facts. It is maintained by the schooner that, with the wind as it was,—she being closehauled and the tug and tow running south,—it was mathematically impossible for her light to have been seen two points abaft of the beam of the tug; but, as it is conceded by the appellant that the schooner was not an overtaking vessel, within article 20 of the international rules of 1885, which were in force at the time of this collision, this question involves nothing of importance, and it follows that article 17 and article 18 of those regulations apply. Therefore we can safely proceed on the theory that it was the duty of the tug and tow to keep out of the way of the schooner, and that the tug, if the vessels were so approaching at any time as to involve risk of collision, was bound to slacken her speed, or stop and reverse, if necessary, and to take all other precautions which might be suitable to avoid the danger arising from the proximity of the various vessels.

There was much discussion at the bar with reference to the relative speed of the two vessels, the solution of which would not aid us without the determination of other elements; but we reach a satisfactory conclusion easily without concerning ourselves in reference to this topic. There is also a dispute whether or not, at any time, the Dillaway saw the green light of the tug, which is of no consequence except as bearing on the question of the vigilance of those who were manning the deck of the schooner, which we will refer to in its proper place.

With reference to the manner in which the tug, with this long tow, was bound to perform her duty in avoiding the schooner, and with reference, also, to the degree of vigilance and preparation which she

was bound to use in that connection, we have already laid down the rule in The Gladiator, 25 C. C. A. 32, 79 Fed. 445–447, and in The Mount Hope, 29 C. C. A. 365, 84 Fed. 910, 912, that, while we cannot condemn tows of this class as unlawful, we must hold them to use extreme care in the interests of common safety. Extreme care with reference to a tug situated as the C. P. Sanford was not only intensifies the ordinary rule requiring a lookout whose business is strictly and solely that of lookout within the requirements of the decisions bearing on that topic, but, from the necessities of the condition, it goes further, inasmuch as a steamer navigating the ocean without a tow, with a sailing vessel coming up on crossing lines, either from the starboard or port, may easily leave the schooner astern. This is impracticable where a tug has a tow of the length of that in the case now before us. It is plain that even greater vigilance must be demanded of a tug and tow like this in question than from large ocean-going steamers, from which, under certain circumstances, two lookouts are required. The Oregon, 158 U. S. 186, 193, et seq., 15 Sup. Ct. 804. Therefore, in addition to the ordinary lookout in his proper position at the bow of the tug, the conditions may, at times, require that the deck of the tug aft shall be properly manned, so that vessels approaching on either the starboard or port beam, in proximity to the tug and tow, may be promptly and seasonably discovered, and the movements of the tug promptly and seasonably directed accordingly. This additional precaution was apparently needed under the peculiar circumstances of the tug in the case at bar, yet there was on the watch during the critical period no person except the man at the wheel and the mate of the tug, also called the pilot. Both these were in the pilot house. Capt. Lewis, of the tug, also happened to be in the pilot house, although it was not his watch. There were windows all around the pilot house, and they were all open. Capt. Lewis says the mate stood on the starboard side, by the window, although he himself says he stood in front of the wheel. The deck hand stood behind the wheel, so that, if Capt. Lewis's testimony is correct, he was in range between the mate and the light of the schooner. There was no other person on the deck of the tug, either forward or aft. Capt. Lewis was sitting down on a cushion on the port side of the pilot house, yet he was the first to discover the schooner's light. The mate testifies that Capt. Lewis was facing towards the starboard, but that he looked around, and could not have seen the schooner's light unless he had turned. He also testifies that the captain called his attention to the light. It is therefore evident from the testimony in behalf of the tug that the discovery of the Dillaway's light was accidental, and by one who was not on the watch or on the lookout, and who was not in position to see it except by chance. This puts it beyond question that the tug was not maintaining a proper lookout, and was very far from exercising that vigilance which her tow required. If the matter alleged in the libel filed by the appellant be taken as alleged,—that, when the tug discovered the light of the Dillaway, she was too far ahead to go under the stern of the schooner,—this alone would demonstrate the lack of a suitable lookout, even if it were not made positive by the evidence to which we

have referred. Therefore, not only was the tug clearly in fault in the matter of a lookout, but the ordinary rule is applicable that, independently of the question whether or not the want of a lookout contributes to a collision, the fact of negligence in that respect, whenever there is a dispute like this at bar, necessarily preponderates with great force against the vessel deficient in that respect, in weighing proofs pro and con, unless they are capable of being reconciled. This practical rule is only an application of the facts that the best disposed persons are prone to imagine theories to excuse the results of their own oversights, and that on the high seas the rapid occurrence of events, in connection with the approach of two colliding vessels at night, naturally leaves confusion in the minds of those who fail to maintain proper vigilance and a state of preparation, and who are, therefore, surprised by unexpected, sudden catastrophes. Taking the facts with reference to the lack of a proper lookout on the part of the tug, in connection with the allegation of her libel that, when the green light of the schooner was sighted, the tug was too far ahead to starboard her wheel and go across the stern of the Dillaway, we cannot escape the conclusion that the tug was at fault. Whether this fault was the sole cause, or only contributed to the result out of which these appeals arise, will be determined when we come to investigate the conduct of the schooner in the light of the pleadings and proofs in the record.

We must notice the fact that the proofs in behalf of the tug do not harmonize with the allegations of her libel. In particular, as we have said, the latter states that when she sighted the schooner the tug was too far ahead to go across the stern of the Dillaway. On the other hand, Capt. Lewis, of the tug, testifies that after he had sighted the schooner he kept his course for about ten minutes, and then slowed down to half speed, so as to give the schooner a chance to go across his bow; that then the schooner bore about a point forward of his beam; that, after remaining slowed down for about five minutes, he saw both lights of the schooner about one-eighth of a mile away, and three points forward of his beam; and that when he saw both lights he put his helm hard a-port, and thus swung to the starboard, inshore. He maintains that half speed entirely stopped the progress of the tug, which is not unreasonable, in view of the strong south wind in her teeth. The tug's engineer testifies that she had been running at about 90 revolutions—which was full speed—until half past 3, when she slowed down to about 40, and that after that she was just about holding her own, thus confirming the testimony of Capt. Lewis on this point. This, however, does not improve the condition of the tug, because, during the 10 minutes after sighting the schooner, in which the tug kept her course and speed, she had sufficient time to starboard her helm, and thus to sheer off, and to run under the stern of the schooner by an ample margin. It was suggested in argument that it was impossible for Capt. Lewis, on first sighting the schooner, to determine whether her course was towards or away from the tow and tug; but he testifies that when he saw the Dillaway he supposed that she was steering about southwest by west, which was on a line rapidly converging with that of his own

course. It is true that it may be argued that some other parts of his testimony conflict with this, but the result of that, if insisted on, would be to neutralize his entire evidence, and thus leave him without any case. Moreover, if he was not sure as to her course, he was bound to guard against the uncertainty.

Capt. Lewis also maintains that after he slowed down he gave the schooner ample room to pass ahead if she had kept her course; testifying that, if she had done so, she would have gone across his bow very readily. On the other hand, Capt. Smith, of the Dillaway, testifies that at first he did not apprehend a collision, but that when he was within about an eighth of a mile of the tug he formed the judgment at the time that, if his vessel should keep her course, she would strike the tug amidships, and that the only thing for him to do was to tack ship, and try to get out of the way. The testimony of Capt. Lewis, while apparently not intended to falsify, was wavering and contradictory, not only on this point, but on many of the more substantial questions in the case. Not only this, but the record shows that the Dillaway was under proper discipline, her deck properly manned, and with a proper lookout; so that, for the reasons we have already given, we must accept the statements from the schooner as against those from the Sanford, where they conflict and cannot be reconciled, with reference to all matters of bearings, courses, and proximity.

In only two particulars does there arise any question with reference to the aspects of the proofs offered by the Dillaway. One of the witnesses testifies that Capt. Smith went below after sighting the tug and before the collision, but Capt. Smith directly contradicts this; and it is not improbable that the witness was mistaken, as Capt. Smith was not actively on the watch, the second mate keeping the deck, so that the master was going to and from the cabin, as circumstances required. He had given orders to be called whenever any lights were seen, or any other emergency demanded him. Again, the witnesses for the Dillaway testify to having seen the green light of the tug shortly before the collision. This fact is not of importance in the case, except as it bears on the vigilance of the schooner. There is no evidence that the tug purposely starboarded so as to expose her green light; but, as the schooner was bearing well on the bow of the tug shortly before the collision, and as the tug had mainly, if not wholly, lost steerageway, so that she might have swung a point or two back and forth with the strong but variable southerly wind, and as, also,—which is not an unusual fact,—the lights of the tug crossed at least half a point, it is not impossible that the schooner might have seen her green light, even though she did not purposely starboard her helm. Therefore the schooner was not only properly manned, with a proper lookout, but her testimony is consistent with itself throughout, and it must be accepted as against that of the tug. It follows we cannot find that the evidence of Capt. Smith that, at the time he tacked, his own judgment was that the vessels would have collided if he had kept his course, is overborne by any proofs in the record.

Therefore, the tug having been grossly at fault in the particulars to which we have referred, and the judgment of Capt. Smith, formed on the spot, having been that her fault would necessarily have brought on a collision if the schooner had held her course, and there being no question as to the maneuvers of the schooner when she tacked, and none that her misstaying was not her fault, is there anything in the case which would justify us in finding that, if she had not changed her course, the collision would not have occurred, or that, even if it would not have occurred, her change of course was not justified, under the circumstances, as in extremis? For the reasons already given, we feel compelled to accept the statement of Capt. Smith that he exercised an honest judgment under the circumstances. It is also to be borne in mind that, if the collision had occurred, probably there would have resulted, from the fact that the vessels approached each other at nearly a right angle, a loss of life. The schooner's drift was towards the tug; and, while the tug had slowed down, so that it may be the vessels would have gone clear if the schooner had held her course, yet the fact that the tug had slowed down, and had come to a standstill, if she did come to a standstill, would not have been known to Capt. Smith, as he bore from the tug at the time the schooner tacked. Thus the schooner was brought into a state of anxious uncertainty by the tug holding her course after the schooner was sighted, or by not sighting her seasonably; and we are unable to say from the record that, if the schooner had continued on her course, a collision would not have resulted. In The H. F. Dimock, 23 C. C. A. 123, 77 Fed. 226, 230, decided by us on September 26, 1896, and in The City of Augusta, 25 C. C. A. 430, 80 Fed. 297, 299, 300, decided by us on April 15, 1897, will be found observations with reference to the effect of the want of a proper lookout on the weight to be given conflicting proofs, and with regard to the result of an exercise of an honest judgment on the part of a vessel in extremis, which are very pertinent to this case. It is thus impossible to determine that the schooner contributed to the collision in such way that the law holds her responsible for it, in whole or in part; and, under the circumstances, we must fall back on the original fault of the tug in not using the extreme care which the law required from her while having so long a tow, and in her consequent omission to sight the schooner seasonably, or to slow down or swing under her stern as soon as she was sighted.

In No. 269 the decree of the district court is affirmed, and the costs of appeal are awarded to the appellees. In No. 270 the decree of the district court is affirmed, with interest, and the costs of appeal are awarded to the appellees.