## THE ADMIRAL SCHLEY.

### THE CHARLES F. MAYER.

(Circuit Court of Appeals, First Circuit. July 6, 1904.)

Nos. 513, 514.

1. COLLISION—TUG WITH LONG TOW—DUTY TO EXERCISE EXTRAORDINARY CARE.

The rule reaffirmed that a tug with a long tow navigating the New England coast will be held to the exercise of extraordinary care, in the interest of common safety.

2. SAME—DANGEROUS SITUATION CREATED WITHOUT NECESSITY.

A vessel may be in fault for a collision in a fog which would not have occurred but for her being in the usual track of vessels leaving a port, where she was there without necessity, although, if it had been in the line of her voyage, she might have been within her right, and not chargeable with fault.

3. SAME—CONTRIBUTORY FAULT—PRESUMPTION.

The rule that where one vessel is shown to have been clearly in fault, without which a collision would not have occurred, the other vessel is to be presumed not in fault, is artificial and misleading unless very carefully applied. The rule may operate in reverse directions according to which vessel's faults are first considered.

4. SAME—RIGHT TO ASSUME OBEDIENCE TO RULES BY OTHER VESSEL.

Also what is sometimes stated as a rule to the effect that a vessel which has come into collision had a right to proceed on the assumption that the other vessel would perform her duty has a limited effect, and is likewise misleading, unless very carefully applied, and it does not reach the circumstances of this case.

5. SAME—MANEUVERING WITH TOW IN FOG—UNNECESSARILY DANGEROUS POSITION.

A steamer, with two coal barges in tow on a line, the whole 2,300 feet in length, deeming it unsafe to enter Boston Harbor because of a dense fog, continued to move slowly about with her tow between the lightship and the harbor entrance, crossing a number of times the usual path of steamers leaving the port, which was known to her master. While mov-

131 F.—28

ing away from the harbor on a course nearly parallel to such path, and just as she had changed her course across it, she heard the signals of a vessel coming out, but did not change her course, and a collision between the two steamers resulted. The outgoing vessel was clearly in fault for excessive speed, but was misled by the course of the tows which she passed, which were still on a course practically parallel with her own. *Held*, that the towing vessel was also in fault for loitering with a tow of such dangerous length in the known way of outgoing vessels without necessity, it not being shown that she could not as well have kept her steerageway by maneuvering further out to sea, or to one side, which fault was aggravated by her failure to change her course back on hearing the other vessel, whose course she had reason to believe she was crossing; the rule prohibiting such change of course in a fog not being applicable under the circumstances.

Appeal from the District Court of the United States for the District of Massachusetts.

For opinion below, see 115 Fed. 378.

Edward S. Dodge and J. Walter Lord (Frederic Dodge, on the brief), for appellant.

Eugene P. Carver (Edward E. Blodgett, on the brief), for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. These appeals arose out of a collision between the steamers Admiral Schley and Charles F. Mayer. The Admiral Schley was a packet steamer bound from Boston to Jamaica. The Charles F. Mayer was a powerful tug, bound into Boston, with two barges in tow, with a total length of tug and tow of about 2,300 feet. The collision was off Boston Harbor, in a thick fog. The District Court held both in fault. There is now no question that the Admiral Schley should be regarded as in fault, which fault, on account of her extreme speed and lack of proper lookout, was grievous. Neither is there any question that her fault contributed to the collision. Indeed, it was the prime cause. The only issue before us is whether the Charles F. Mayer was also in fault.

With reference to tugs with long tows on our New England coast, we have in several instances laid down the positive rule which applies here. In The Berkshire (decided June 23, 1896) 74 Fed. 906, 910, 21 C. C. A. 169, we said that we did not know that we would be authorized to deem as unsafe the use of a narrow channel by a tug, with its tow on a hawser of customary length, more than by a large propeller of considerable draft and speed; but in The Gladiator, 79 Fed. 445, 446, and 447, 25 C. C. A. 32, we also said that we must hold tugs which navigate the New England coast, with long and peculiarly hazardous tows, to the use of the extremest care, in the interest of common safety. We reaffirmed this proposition in the Mt. Hope, 84 Fed. 910, 912, 29 C. C. A. 365, The Samuel Dillaway, 98 Fed. 138, 141, 38 C. C. A. 675, and The Gertrude, 118 Fed. 130, 131, 55 C. C. A. 80. The same rule is held by the Circuit Court of Appeals for the Second Circuit in The H. M. Whitney, 86 Fed. 697, 700, 30 C. C. A. 343.

In disposing of these appeals, we rely on nothing except what is admitted by the Charles F. Mayer, or is shown by official publications

of the United States, including their charts, and list of lights and fog signals, or by facts commonly known. When we use the word "mile," we mean a nautical mile. Boston Light, Thieves' Ledge Buoy, and Boston Lightship are very nearly in line. The Lightship bears E. ½ S., $5^{15}/_{16}$ miles, from the Boston Light; Thieves' Ledge Buoy is about two miles easterly from the Light, and about four miles westerly from the Lightship; and Minot's Ledge Lighthouse bears from the latter 4⅛ miles S. by W. ¼ W. There is an abundance of water in the easterly part of the triangle made by the Boston Light, Boston Lightship, and Minot's Ledge, and, of course, an abundance of water seaward thereof.

The Charles F. Mayer admits that the fog, at all the times necessary to consider, was thick. One expression used is: "The fog being still very thick." Another is: "The fog shut down thick again." It is also natural that a steamer coming out of Boston, as the Schley was, in a fog, would endeavor to pick up the Lightship. Consequently, Capt. McLeod, master of the Charles F. Mayer, admits that such a steamer would usually go near, or head towards, Boston Lightship, if she could hear its whistle, whenever bound for Cape Cod, the West Indies, Europe, New York, Baltimore, Philadelphia, or any ports to the south, or, in fact, going through Vineyard Sound. He testifies, however, that a vessel going to Gloucester, Portsmouth, Portland, Halifax, or other ports easterly, would pick up Thieves' Ledge Buoy, if she could, and take her course northerly from that. It is a matter of common knowledge that the navigation which would pick up Boston Lightship, as stated by Capt. McLeod, is by far the larger portion of that sailing from Boston, and is very large at all portions of the year. Consequently, a vessel crossing the line from Boston Light to Boston Lightship of E. ½ S., would directly across the more largely traveled path.

The collision occurred between Boston Lightship and Thieves' Ledge Buoy; Capt. McLeod placing it about a mile to the west of the Lightship, and the master of the Schley about a mile and a half to the east of Thieves' Ledge Buoy. The admitted point of collision demonstrates that the course of the Schley, coming out of Boston, must have been as described by Capt. McLeod for vessels bound southerly; that is, picking up the Lightship. At the same time, the position of the Mayer, as worked out by ourselves, was as follows: Capt. McLeod thus describes his movements, so far as we need notice them: He was running a course S. S. E. about half past 11, when, the fog having begun to lift, and thinking it would have cleared up by the time he reached the entrance to the harbor, he turned on a course N. W. by W. ½ W., and passed the Lightship close on his starboard hand. Thus he ran northerly of the bearing from the Lightship to the Boston Light, and therefore across, and northerly of, the course that would be taken by a vessel outward bound for Jamaica. In other words, he brought himself so that he and his tow, in all, as we have said, covering about 2,300 feet, was crossing the path of all the navigation bound as we have described. At half past 12, however, the fog shut down thick again, and he turned back on a course E. by S., which, about 10 minutes afterwards, he changed to E. by N. to pass a schooner on his starboard

bow. During these maneuvers, and to the time the Schley was heard, about 15 minutes after turning on the course E. by N., the speed of the tug was maintained at about one knot and one-half per hour. After turning on the E. by N. course, she prepared to shorten hawsers, and commenced to swing her head to port on a course N. N. E. When she had swung three or four points on the last turn, Capt McLeod heard a sound abaft his port beam, which he could not clearly identify as a whistle. A minute later, a fog signal of a steamer was heard, still abaft the port beam, which was reported by the lookout. Shortly after, the Schley loomed up about 500 or 600 feet away, heading for the Mayer's pilot house, and on her port. What followed related to vessels in extremis, and we need not pursue it.

We have stated these facts for the purpose of showing with detail how the Charles F. Mayer, with her long tow, was moving slowly across the course of navigation out of Boston, bound to Europe or southerly, as Capt. McLeod explained it and understood it. This course, as we have shown, was substantially E. by S. The course of the Charles F. Mayer, before she made her turn in order to shorten hawsers, was, as we have said, E. by N.; and she was, therefore, crossing the path of navigation at an acute angle. After she began her last turn, to come on the course of N. N. E., she was running across the path of navigation out of Boston at an angle nearing seven points, and therefore practically at a right angle to it. Of course, she was properly proceeding very slowly, and was required to do so; but, unfortunately, her care in this respect endangered the particular position she was in, so that, in this sense, we may say she was loitering. It needs nothing in addition to the mere statement of these facts to demonstrate that for this tug and her long tow to be in the position in which she was at the time of the collision was presumptively not only a fault, but a gross fault; and this is especially so, in view of our rule already referred to, and last stated in The Gertrude. That this presumptive fault contributed to the collision cannot be denied, because the collision could not have occurred if the Charles F. Mayer had not been crossing this path of navigation, and perhaps not if she had not been loitering thereon. Under these circumstances, the burden rests on her to clearly justify her locality, if she can do so.

The Charles F. Mayer claims that it was necessary for her to keep on steerage way during the thick fog, because, on account of the heavy weather, it was impracticable for her to anchor in that neighborhood; and it may be that the well-known facts of the locality, supplemented by her evidence, sustain this proposition, but this in only a general way. It would not justify her keeping under way in an improper locality. She also asks whether she would have been in fault if she had been crossing, as she was crossing, but in the direct line of her voyage, assuming that she had been bound for some Northern port; and whether the circumstance that, instead of being in the line of her voyage, she was maneuvering as she was maneuvering, constitutes any essential distinction. The distinction is that, if in the line of her voyage, she would ordinarily have been within her right, although on a hypothetical question no one can answer positively. If within her

light, it would follow that ordinarily she would have been entitled to avail herself of it, though it involved danger to others.

It has not been specially pressed upon us that the Charles F. Mayer found it prudent to keep her bearings and thus retain knowledge of her position; but we may reasonably suppose that such was the fact. Nevertheless, even on this supposition, it was her duty to show us clearly that she could not have accomplished this by making use of some other lights or signals within reasonable range. Indeed, she has offered no specific proof on this topic, not even to show that it was needful for her to keep her bearings, as we have suggested, or that she might not prudently have run out to sea. In the absence of anything of this nature, the common knowledge of that part of our coast, and especially the presumption that the Mayer might have sufficiently preserved her bearings while remaining southerly of the path of navigation, and in the easterly part of the triangle of which we have already spoken, made by Boston Light, Boston Lightship, and Minot's Ledge Lighthouse, leave the case resting heavily against her with reference to this class of suggestions.

The Mayer relies on The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, in which case she claims it was decided that, as the Umbria was running under an excessive speed of about 20 knots, the alleged fault on the part of the Iberia, with which steamer she collided, could not be taken into account. But the fact is that a majority of the court held the Iberia was not in fault, while the other justices were of the opinion that, if she had been in fault, the fault did not contribute to the collision. Therefore the decision is not effectual here. We have sufficiently expressed our views of The Umbria in The Columbian (D. C.) 100 Fed. 991, 994, and in The Gertrude, 118 Fed. 130, 132, 55 C. C. A. 80, where we said that the Iberia was in extremis from the moment she heard the signals of the Umbria. However, it is impossible to concede that there is any analogy between a tug like the Charles F. Mayer, "loitering" with her tow, and a steamer like the Iberia, which, at least, was endeavoring to escape by some action on her own part.

We are not prepared to condemn the Charles F. Mayer for not giving special signals, because it is settled law that, unless in extreme cases, to give signals not called for by the international rules may be a fault; and especially, under circumstances like those at bar, of a thick fog, with numerous vessels in the neighborhood, such signals may produce confusion. The Oregon, 158 U. S. 186, 200, 201, 202, 203, 15 Sup. Ct. 804, 39 L. Ed. 943. We appreciate the fact that, under the circumstances, the master of the Mayer came suddenly into a thick fog off Boston Harbor, and thus was brought unexpectedly into a difficult position; and we do not overlook the fact that, in a condition of maritime difficulty, the question is not necessarily whether the commanding officer made an error, but merely one of good seamanship. We have expressed this with reference to very peculiar circumstances in The Carbonero, 122 Fed. 753, 755, 58 C. C. A. 553. However, the error of the Mayer was so glaring that no claim of good seamanship can save her. Indeed, Capt. McLeod seems not to have relied so much on his own judgment as on what he regarded as a custom, in accordance with which it was the practice of tows to maneuver as he did in that locality

in a fog. Therefore these appeals do not raise so much a question of seamanship as they press upon us anew for our consideration one of the various practices of vessels in thick weather, both steamers and sailing vessels, some of them in violation of the international rules, which the courts are so frequently compelled to condemn.

We have shown that, just before the Charles F. Mayer heard the Schley coming out from Boston, she starboarded her helm, coming on the N. N. E. course, and continued to keep a starboard wheel, notwithstanding her master, Capt. McLeod, knew, or at any rate supposed, that the Schley was running towards her. The Schley, in her libel, distinctly charged this as a fault; also, in her answer to the libel in behalf of the Mayer, it is alleged that the Schley first saw one barge heading in the same direction as herself, and again a second barge still proceeding on the same parallel course, and that then, suddenly, she saw the Mayer crossing her path from starboard to port. The course of the barges would tend to mislead the Schley as to the supposed course of the tug, unless she was very attentive to lookout and signals. The testimony in behalf of the Mayer admits the substance of this. Nevertheless, Capt. McLeod continued to keep under his starboard wheel, and thus to complete a cul-de-sac in which the Schley was trapped; while, if he had ported his wheel when he first heard the Schley, and brought himself in line with his tow, he would have given the Schley more sea room, and the collision would have been avoided, as the Mayer merely caught the Schley's starboard quarter about 50 feet from her stern.

It is doubtful whether these steamers, under the circumstances, were in such a condition that the Mayer was bound by the international rules with reference to keeping her course; and it is still more difficult to determine what is the effect of these international rules when a vessel, being overtaken, is already under a port or starboard wheel. Indeed, so far as they are concerned, it is said in Marsden's Collisions at Sea (4th Ed.) 381, as follows:

"An alteration of the helm in a fog, when the other ship cannot be seen and only her whistle is heard, is not necessarily negligence, though it is made merely upon a guess as to the distance, course, speed, and direction of the other ship. As a general rule, in such circumstances, a ship should not alter her course; but each case must depend upon its own circumstances, and it cannot be laid down that every alteration of course, in ignorance of the position and course of the other ship, is in itself a fault."

The author in this particular is fully sustained by The Vindomera (1891) A. C. 1, where the syllabus, which correctly represents the decision, uses practically the same language as Mr. Marsden. Nevertheless, although the international rules do not literally apply, and although the fact that the Mayer kept her starboard wheel after she heard the whistle of the Schley was not her primary fault, yet it certainly aggravated it, and aids to expound and measure it as a serious one.

Two propositions have been brought to our attention incidentally, if not directly, namely: First, that as the case shows that the Schley was clearly guilty of a gross fault, the Mayer is presumed not to have been in fault; and, second, that the Mayer was proceeding slowly, with perfect discipline, as was the fact, while the Schley was moving rapidly in a thick fog, without discipline, and this to such an extent that she failed to hear the signals from the Mayer, all of which is

also true. It is said consequently that, if the Schley had had a proper lookout, or had been proceeding with the required care as to speed, the collision could not have occurred, which is also true. Therefore it is suggested that the Mayer was not bound to anticipate that a steamer would come out of Boston committing such gross faults as were exhibited by the Schley, so that the Mayer cannot be charged because she did not guard against the possibility of this occurring. The first proposition, which is often stated by the authorities, is artificial, and is misleading unless very carefully applied. In ordinary cases, it would operate in reverse directions, according to which vessel's faults are first considered in ascertaining the causes of the collision. So far as the second is concerned, the rule is also artificial, and also, unless applied very carefully, misleading. The Schley had as much right to assume that the Mayer would not be loitering on the path of navigation, and to govern herself accordingly, as the Mayer had to assume that the Schley would not violate the international rules. The authorities, however, which have used this proposition, have had a very limited effect.

They may be illustrated by The Servia, 149 U. S. 144, 153, 13 Sup. Ct. 817, 37 L. Ed. 681, and the cases there cited, and by The Victory and the Plymothian, 168 U. S. 411, 426, 18 Sup. Ct. 149, 42 L. Ed. 519. The decisions named, and nearly all the cases cited by them, bear against the Mayer, instead of in her favor, because each turns on the assertion that one vessel was bound to anticipate that the other would take the course customarily taken by her. In each, the vessel expected to take the customary course failed to do so, so that the other vessel was exonerated. On the present appeals, however, the Mayer disregarded the presumption which the cases cited state, to the effect that vessels usually take known customary courses, which presumption, as applied to the present collision, charged the Mayer with the special duty of avoiding the Schley, and other vessels coming out of Boston, by the customary path. However, this topic is correctly disposed of by the statement which we have already made that the Schley was under no more obligation to assume that the Mayer would violate maritime rules than the Mayer was to assume that the Schley would do the same. If the second proposition were acceded to generally, there would hardly ever be a division of damages on account of the faults of both vessels involved in a collision, and it is only under extreme circumstances that it can possibly have any application. We must refuse to admit it here.

On the whole, these appeals seem to be within the practical rules applied by the Circuit Court of Appeals for the Second Circuit in The H. M. Whitney, 86 Fed. 697, 701, 30 C. C. A. 343.

In No. 513, The Admiral Schley, the decree of the District Court is affirmed, and the appellee recovers its costs of appeal.

In No. 514, The Charles F. Mayer, the decree of the District Court is affirmed, with interest, and the appellee recovers its costs of appeal.