## THE KENTUCKY.

(District Court, S. D. New York. October 25, 1906.)

1. COLLISION—STEAMSHIPS—EXCESSIVE SPEED IN FOG. ·

A steamship navigating in a fog at such rate of speed that when another vessel, which was practically motionless, came into view, she was unable to stop in time to avoid collision, was in fault for excessive speed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 170.

Collision rules as to speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. SAME—VESSEL LYING IN FRONT OF ENTRANCE TO CHANNEL.

A steamship, after passing out to sea from New York Bay through Gedney Channel, stopped to discharge her pilot some 800 to 1,000 feet outside of the entrance to the channel, which is about 1,150 feet wide. She lay to the north of the center of the channel extended, so that both she and the pilot boat which lay near were in the usual pathway of vessels approaching to enter the starboard side of the channel; her position being such that she presented an obstruction some 200 feet in width to an approaching vessel. There was a dense fog, and another steamship approaching to enter the channel at an excessive speed came into collision with her. *Held,* that while it would have been a more prudent course for her to keep to the south side of the channel extended, or to go entirely outside it, yet, being in the open ocean, her failure to do so did not constitute a fault which contributed to the collision, and that she was not liable therefor, no other fault being shown.

3. SAME—SUIT FOR COLLISION—LOG BOOKS AS EVIDENCE.

The log books of a vessel are properly admissible in evidence in a collision suit, when called for by the other party on cross-examination of opposing witnesses, and their testimony is more intelligible by a reference to the books.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 264.]

In Admiralty. Suit for collision.

Butler, Notman & Mynderse, for libellants.
Wing, Putnam & Burlingham, for claimants.

ADAMS, District Judge. This action was brought by Charles G. Hill and another, owners of the steamship Exeter City and bailees of the cargo on board, against the steamship Kentucky, to recover the damages, alleged to amount to about $60,000, suffered by reason of a collision which occurred between those vessels at 5.32 o'clock P. M. on the 27th day of May, 1905, just outside of the buoys of Gedney Channel.

The Exeter City, 286 feet long, left her anchorage near 14th street, Hoboken, with a miscellaneous cargo, including some cattle on deck, bound for Bristol, England, about 2 o'clock P. M. She was under the charge of a Sandy Hook pilot. A little after 4 o'clock P. M., when nearly abreast of Bell Buoy (Main Channel) the steamer ran into a fog bank, which became very dense. At 4.50 o'clock P. M. she made the Gedney Channel buoys and when abreast of the eastern buoy, she heard the siren of a steam pilot boat, which subsequently turned out to be the New York, and she stopped her engines. At 5.23 o'clock, she saw the pilot boat's cutter on her starboard bow and by reversing her engines brought herself to a standstill, except for the effect of an ebb tide. With the effect of the tide and the remnants of her speed, she reached a point probably between 800 and 1000 feet outside of the channel buoys before she lost all momentum from the effect of her engines. So without motion through the water was she that it became necessary to give the engines a touch ahead, causing the steamer to move through the water about 15 or 20 feet, in order to pull the pilot's skiff alongside by means of a line so that he might be discharged. Her head had been turned somewhat to the northward, so that she was finally lying headed about E. N. E. and presented her side to vessels approaching the channel. Through all this time she had an efficient lookout properly stationed and attending to his duties.

The steam pilot boat New York, 150 feet long, was on duty the day of the collision. She was lying outside of the entrance buoys, awaiting the approach of the Exeter City in order to take off her pilot, who was to be discharged when, or soon after, the ocean should be reached. Her position when the Exeter City came out was somewhat to the northward and eastward of that steamer and she was also practically motionless, except for the ebb current, and heading about N. N. E. The two vessels were not far enough apart for any other vessel to navigate between them and they effectually blocked the approach of an incoming vessel to the starboard side of the channel, which altogether was about 575 feet in width, the whole channel being about 1150 feet wide.

The Kentucky left Copenhagen on the 9th of May bound for New York. She carried little more than half cargo and was therefore quite light, drawing but 10.2 feet forward and 15.3 feet aft, a mean draft of 12.8, against an average loaded draft of 21 feet. On the day before she arrived in New York, she was further lightened by casting overboard some 200 tons of ballast carried on deck. Altogether she

was so light that her propeller was not fully immersed, and probably not as effective as when fully covered. On the day of this collision, she was approaching New York, passing the Fire Island Lightship at 1.15 o'clock P. M. The weather was misty and she was regularly sounding fog signals, which were continued up to the time of the collision. About 4.45 P. M. a New York Sandy Hook pilot was taken on board and he took charge of the navigation, though the master, second officer and an able seaman, at the wheel, remained on the bridge. The master stood at the telegraph, which he was operating under the pilot's orders. There was a vigilant lookout duly stationed. After the pilot was taken aboard the regular course of W. N. W. ¼ W. was followed. The Whistling Buoy was passed on the port side, less than a length away, and shortly afterwards the water line of the side of the New York came into view, about two lengths of the Kentucky away, bearing a point on the starboard bow. The engines of the Kentucky were at this time stopped, in consequence of some signal having been heard from the siren of the New York. An order was then given to starboard the wheel a little in order to clear the New York and just afterwards the Exeter City came into view heading E. N. E., at an angle of about 45° with the course of the Kentucky and showing her starboard side. The Kentucky was heading about for her foremast. An order was at once given to put the helm hard-a-starboard and to reverse the engines at full speed. She answered her helm somewhat but took a cant to starboard from the backing. Her starboard bow came into contact with the Exeter City's starboard quarter, penetrating some distance and doing the damage above stated.

The principal fault alleged against the Kentucky is that she was proceeding at an excessive rate of speed in view of the foggy condition of the weather. Up to the time of passing the Whistling Buoy, she was under half speed, which would give her a rate of about 7 knots, her full speed being 10 knots, then she slowed bringing her speed down to the rate of about 5 knots, and then proceeded at half speed again, doubtless for the purpose of preserving the pilot's dead reckoning in reaching Gedney Channel. Her engine's revolutions at full speed were from 70 to 75, half speed 47 or 48 and slow 36 to 38. She probably had not acquired her full half speed velocity just before approaching the steamer New York and Exeter City. It is admitted that she was then going at the rate of 3 or 4 knots but was probably going considerably in excess of 5 knots at the time. In any event, she was clearly violating the rule that steamers navigating in a fog are bound to reduce their speed to such rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such an approaching vessel is herself going at the moderate speed required by law. The Chattahoochee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 43 L. Ed. 801. As the Exeter City here was practically not moving, the latter part of the rule need not be considered and this proves to be a case where the implicated vessel was going at such a rate that she could not bring herself to stop before striking a motionless vessel. The Kentucky was clearly in fault and the only real question in the case is whether the Exeter City was also in fault.

Numerous charges were urged against her, and among them the following, which are the only ones requiring attention, viz.: (1) that she was not equipped with a proper and efficient steam whistle and no proper whistles were sounded as the Kentucky was heard approaching but the Exeter City was relying upon the whistles of the pilot boat, (2) that she was lying inertly across the track of inward bound shipping even after warning by the repeated whistles of the Kentucky, (3) that after the Kentucky was seen, the Exeter City did nothing effective to avoid collision and failed to take any precautions obligatory upon her in thus lying athwart the fairway, either with her helm or screw.

1. The Exeter City had an ordinary steam whistle for a vessel of her character. It was so testified by her officers and the whistle was subsequently taken out of her and examined in New York, where it was shown to be of the proper size and sounding capacity. It was then returned to the vessel. I conclude, therefore, that it was a proper and efficient whistle. On the question of its proper use on this occasion, it appears that she was sounding it at proper intervals as she proceeded through the channel and at 5.23 P. M. having made the pilot boat cutter on the starboard bow, the engines were put slow astern and the pilot discharged. A whistle was then heard on the starboard side, and a long blast given by her in reply. A few moments afterwards, another whistle was heard which was replied to by a similar blast from the Exeter City's whistle. At about the same time the New York sounded a danger signal from her siren. Almost immediately after the second blast from the Exeter City, the Kentucky, from which the approaching signal had come, appeared on the starboard side, heading directly for the Exeter City. The latter's telegraph was then rung full speed ahead and 2 short blasts given by her steam whistle, but the Kentucky came on and the collision happened. It was testified by those on the Kentucky that no whistles were heard from the Exeter City. It is urged by the Kentucky that her failure to hear the whistles of the Exeter City was not due to any inattention but rather to the small size of the Exeter City's whistle, and the circumstance that those on that vessel permitted the small sound of her whistle to be drowned out by the double siren blasts from the New York close alongside. It has been shown that the Exeter City's whistle was not unusually small, and if her blasts were drowned out by the stronger ones of the New York, it was not a fault on the part of the former. It is not true that she was relying upon the New York's signals but was in fact giving her own.

2. It is true that the Exeter City in being to the northward of a prolongation of the axis of the channel, between it and the northernmost side of the approach, was lying across the track of inward bound shipping, but whether she was in fault for doing so has been the most strongly contested point in the case. A great deal of testimony has been taken upon the question from the pilots of the harbor. Many say that it was imprudent for the Exeter City to be there; others say that when a vessel passes the outside buoys she is free to adopt any course she sees fit with respect to proceeding. I think it would have

been more prudent for the vessel not to have partly blocked the approach to the channel, which incoming vessels would naturally take under Art. 25, requiring them to use the starboard side. She necessarily saw that, in connection with the New York, she would be an obstacle to such vessels and it would seem that if she were going to remain in the prolongation of the channel, it would have been better for her to have made a lee for the discharge of the pilot by turning to the starboard or better still to go entirely outside. There was plenty of water on both sides of an extension of the channel so that there was no necessity for being within it on either side and if, in view of the condition of the atmosphere, she had gone entirely outside, danger would have been avoided. As a matter of common prudence, I should say that a course to the south side of, or entirely outside, should have been adopted, but did the neglect to observe either of these precautions contribute to the collision so as to render the Exeter City partly in fault? It seems not. This collision happened upon the open ocean. The obstacle which the Exeter City presented to the Kentucky was small, her length of 286 feet and her diagonal position to the Kentucky made it about 200 feet as compared with 2300 feet, the length of the tow in The Admiral Schley, 131 Fed. 433, 65 C. C. A. 417, and Id. (C. C. A.) 142 Fed. 64, relied upon by the Kentucky here. Moreover, that case appears to have turned largely upon the condemnation which the courts are apt to visit upon the navigating power of tows of great length when they get into collision through such fault. It does not seem to be applicable here.

It is also contended that the Exeter City remained too long in the position she occupied across the channel. It was from 7 to 10 minutes, but several minutes were necessarily consumed in signing the pilot's card for which the captain had to go to his cabin, and then the pilot had to enter and start with his skiff. He was in it, not more than 100 feet from the steamer, when the collision occurred. The time occupied does not seem very great under the circumstances and the length of time does not seem to be a fault.

3. After the Kentucky was seen, there was no time for the Exeter City to do anything to avoid the collision. She tried to move ahead, which was a proper effort on her part, but did not succeed in getting out of the Kentucky's way, owing to the latter's speed.

This collision seems to be entirely attributable to the Kentucky. Her fault of excessive speed in a fog is plain and sufficiently accounts for the disaster. In order to attribute fault to the Exeter City, it would be necessary to resort to an involved state of affairs and consequent uncertainties, which should not be done when a collision can be fully accounted for by a manifest fault on the part of the other vessel.

A question arose in the case concerning the receipt of the Kentucky's log books in evidence. They were used during the examination, de bene esse, of some of her witnesses, and marked for identification. Ordinarily the entries in such books are not receivable in support of the party who makes them (Worrall v. Davis Coal & Coke Co. [D. C.] 113 Fed. 549, 557), but where they are called for and made use of

by the other party for the purpose of cross examining the opposing witnesses and the testimony so adduced is more intelligible by a reference to the books, which is the case here, they should be received. These books will be regarded as in evidence.

There will be a decree for the libellants, with an order of reference.